GINSBERG *v.* NEW YORK.

No. 47. Argued January 16, 1968.—Decided April 22, 1968.

*Emanuel Redfield* argued the cause for appellant. With him on the brief was *Benjamin E. Winston.*

*William Cahn* argued the cause for appellee. With him on the brief was *George Danzig Levine.*

Briefs of *amici curiae,* urging reversal, were filed by *Osmond K. Fraenkel, Edward J. Ennis, Melvin L. Wulf* and *Alan H. Levine* for the American Civil Liberties Union et al., by *Morris B. Abram* and *Jay Greenfield* for the Council for Periodical Distributors Associations, Inc.,

by *Horace S. Manges* and *Marshall C. Berger* for the American Book Publishers Council, Inc., and by *Irwin Karp* for the Authors League of America, Inc.

Brief of *amicus curiae,* urging affirmance, was filed by *Charles H. Keating, Jr.,* and *James J. Clancy* for the Citizens for Decent Literature, Inc.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

This case presents the question of the constitutionality on its face of a New York criminal obscenity statute which prohibits the sale to minors under 17 years of age of material defined to be obscene on the basis of its appeal to them whether or not it would be obscene to adults.

Appellant and his wife operate "Sam's Stationery and Luncheonette" in Bellmore, Long Island. They have a lunch counter, and, among other things, also sell magazines including some so-called "girlie" magazines. Appellant was prosecuted under two informations, each in two counts, which charged that he personally sold a 16-year-old boy two "girlie" magazines on each of two dates in October 1965, in violation of § 484–h of the New York Penal Law. He was tried before a judge without a jury in Nassau County District Court and was found guilty on both counts.[1] The judge found (1) that the

---

[1] Appellant makes no attack upon § 484–h as applied. We therefore have no occasion to consider the sufficiency of the evidence, or such issues as burden of proof, whether expert evidence is either required or permissible, or any other questions which might be pertinent to the application of the statute. Appellant does argue that because the trial judge included a finding that two of the magazines "contained verbal descriptions and narrative accounts of sexual excitement and sexual conduct," an offense not charged in the informations, the conviction must be set aside under *Cole* v. *Arkansas,* 333 U. S. 196. But this case was tried and the appellant

magazines contained pictures which depicted female "nudity" in a manner defined in subsection 1 (b), that is "the showing of . . . female . . . buttocks with less than a full opaque covering, or the showing of the female breast with less than a fully opaque covering of any portion thereof below the top of the nipple . . . ," and (2) that the pictures were "harmful to minors" in that they had, within the meaning of subsection 1 (f)

---

was found guilty only on the charges of selling magazines containing pictures depicting female nudity. It is therefore not a case where defendant was tried and convicted of a violation of one offense when he was charged with a distinctly and substantially different offense.

The full text of § 484–h is attached as Appendix A. It was enacted in L. 1965, c. 327, to replace an earlier version held invalid by the New York Court of Appeals in *People* v. *Kahan*, 15 N. Y. 2d 311, 206 N. E. 2d 333, and *People* v. *Bookcase, Inc.*, 14 N. Y. 2d 409, 201 N. E. 2d 14. Section 484–h in turn was replaced by L. 1967, c. 791, now §§ 235.20–235.22 of the Penal Law. The major changes under the 1967 law added a provision that the one charged with a violation "is presumed to [sell] with knowledge of the character and content of the material sold . . . ," and the provision that "it is an affirmative defense that: (a) The defendant had reasonable cause to believe that the minor involved was seventeen years old or more; and (b) Such minor exhibited to the defendant a draft card, driver's license, birth certificate or other official or apparently official document purporting to establish that such minor was seventeen years old or more." Neither addition is involved in this case. We intimate no view whatever upon the constitutional validity of the presumption. See in general *Smith* v. *California*, 361 U. S. 147; *Speiser* v. *Randall*, 357 U. S. 513; 41 N. Y. U. L. Rev. 791 (1966); 30 Albany L. Rev. 133 (1966).

The 1967 law also repealed outright § 484–i which had been enacted one week after § 484–h. L. 1965, c. 327. It forbade sales to minors under the age of 18. The New York Court of Appeals sustained its validity against a challenge that it was void for vagueness. *People* v. *Tannenbaum*, 18 N. Y. 2d 268, 220 N. E. 2d 783. For an analysis of § 484–i and a comparison with § 484–h see 33 Brooklyn L. Rev. 329 (1967).

"that quality of . . . representation . . . of nudity . . . [which] . . . (i) predominantly appeals to the prurient, shameful or morbid interest of minors, and (ii) is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors, and (iii) is utterly without redeeming social importance for minors." He held that both sales to the 16-year-old boy therefore constituted the violation under § 484–h of "knowingly to sell . . . to a minor" under 17 of "(a) any picture . . . which depicts nudity . . . and which is harmful to minors," and "(b) any . . . magazine . . . which contains . . . [such pictures] . . . and which, taken as a whole, is harmful to minors." The conviction was affirmed without opinion by the Appellate Term, Second Department, of the Supreme Court. Appellant was denied leave to appeal to the New York Court of Appeals and then appealed to this Court. We noted probable jurisdiction. 388 U. S. 904. We affirm.[2]

---

[2] The case is not moot. The appellant might have been sentenced to one year's imprisonment, or a $500 fine or both. N. Y. Penal Law § 1937. The trial judge however exercised authority under N. Y. Penal Law § 2188 and on May 17, 1966, suspended sentence on all counts. Under § 470–a of the New York Code of Criminal Procedure, the judge could thereafter recall appellant and impose sentence only within one year, or before May 17, 1967. The judge did not do so. Although *St. Pierre* v. *United States,* 319 U. S. 41, held that a criminal case had become moot when the petitioner finished serving his sentence before direct review in this Court, *St. Pierre* also recognized that the case would not have been moot had "petitioner shown that under either state or federal law further penalties or disabilities can be imposed on him as result of the judgment which has now been satisfied." *Id.,* at 43. The State of New York concedes in its brief in this Court addressed to mootness "that certain disabilities do flow from the conviction." The brief states that among these is "the possibility of ineligibility for licensing under state and municipal license laws regulating various lawful occupations . . . ." Since the argument, the parties advised the Court that, although this is the first time appellant has been convicted of any

634

## I.

The "girlie" picture magazines involved in the sales here are not obscene for adults, *Redrup* v. *New York,* 386 U. S. 767.[3] But § 484–h does not bar the appellant

crime, this conviction might result in the revocation of the license required by municipal law as a prerequisite to engaging in the lunch-eonette business he carries on in Bellmore, New York. Bellmore is an "unincorporated village" within the Town of Hempstead, Long Island, 1967 N. Y. S. Leg. Man. 1154. The town has a licensing ordinance which provides that the "Commissioner of Buildings . . . may suspend or revoke any license issued, in his discretion, for . . . (e) conviction of any crime." LL 21, Town of Hempstead, eff. December 1, 1966, § 8.1 (e). In these circumstances the case is not moot since the conviction may entail collateral consequences suffi-cient to bring the case within the *St. Pierre* exception. See *Fiswick* v. *United States,* 329 U. S. 211, 220–222. We were not able to reach that conclusion in *Tannenbaum* v. *New York,* 388 U. S. 439, or *Jacobs* v. *New York,* 388 U. S. 431, in which the appeals were dis-missed as moot. In *Tannenbaum* there was no contention that the convictions under the now repealed § 484–i entailed any collateral consequences. In *Jacobs* the appeal was dismissed on motion of the State which alleged, *inter alia,* that New York law did not impose "any further penalty upon conviction of the misdemeanor here in issue." Appellant did not there show, or contend, that his license might be revoked for "conviction of any crime"; he asserted only that the conviction might be the basis of a suspension under a pro-vision of the Administrative Code of the City of New York requiring the Department of Licenses to assure that motion picture theatres are not conducted in a manner offensive to "public morals."

[3] One of the magazines was an issue of the magazine "Sir." We held in *Gent* v. *Arkansas,* decided with *Redrup* v. *New York,* 386 U. S. 767, 769, that an Arkansas statute which did not reflect a specific and limited state concern for juveniles was unconstitutional insofar as it was applied to suppress distribution of another issue of that magazine. Other cases which turned on findings of nonobscenity of this type of magazine include: *Central Magazine Sales, Ltd.* v. *United States,* 389 U. S. 50; *Conner* v. *City of Hammond,* 389 U. S. 48; *Potomac News Co.* v. *United States,* 389 U. S. 47; *Mazes* v. *Ohio,* 388 U. S. 453; *A Quantity of Books* v. *Kansas,* 388 U. S. 452; *Books, Inc.* v. *United States,* 388 U. S. 449; *Aday* v. *United States,*

from stocking the magazines and selling them to persons 17 years of age or older, and therefore the conviction is not invalid under our decision in *Butler* v. *Michigan,* 352 U. S. 380.

Obscenity is not within the area of protected speech or press. *Roth* v. *United States,* 354 U. S. 476, 485. The three-pronged test of subsection 1 (f) for judging the obscenity of material sold to minors under 17 is a variable from the formulation for determining obscenity under *Roth* stated in the plurality opinion in *Memoirs* v. *Massachusetts,* 383 U. S. 413, 418. Appellant's primary attack upon § 484-h is leveled at the power of the State to adapt this *Memoirs* formulation to define the material's obscenity on the basis of its appeal to minors, and thus exclude material so defined from the area of protected expression. He makes no argument that the magazines are not "harmful to minors" within the definition in subsection 1 (f). Thus "[n]o issue is presented . . . concerning the obscenity of the material involved." *Roth, supra,* at 481, n. 8.

The New York Court of Appeals "upheld the Legislature's power to employ variable concepts of obscenity" [4]

---

388 U. S. 447; *Avansino* v. *New York,* 388 U. S. 446; *Sheperd* v. *New York,* 388 U. S. 444; *Friedman* v. *New York,* 388 U. S. 441; *Keney* v. *New York,* 388 U. S. 440; see also *Rosenbloom* v. *Virginia,* 388 U. S. 450; *Sunshine Book Co.* v. *Summerfield,* 355 U. S. 372.

[4] *People* v. *Tannenbaum,* 18 N. Y. 2d 268, 270, 220 N. E. 2d 783, 785, dismissed as moot, 388 U. S. 439. The concept of variable obscenity is developed in Lockhart & McClure, Censorship of Obscenity: The Developing Constitutional Standards, 45 Minn. L. Rev. 5 (1960). At 85 the authors state:

"Variable obscenity . . . furnishes a useful analytical tool for dealing with the problem of denying adolescents access to material aimed at a primary audience of sexually mature adults. For variable obscenity focuses attention upon the make-up of primary and peripheral audiences in varying circumstances, and provides a reasonably satisfactory means for delineating the obscene in each circumstance."

in a case in which the same challenge to state power to enact such a law was also addressed to § 484–h. *Bookcase, Inc.* v. *Broderick,* 18 N. Y. 2d 71, 218 N. E. 2d 668, appeal dismissed for want of a properly presented federal question, *sub nom. Bookcase, Inc.* v. *Leary,* 385 U. S. 12. In sustaining state power to enact the law, the Court of Appeals said, *Bookcase, Inc.* v. *Broderick,* at 75, 218 N. E. 2d, at 671:

> "[M]aterial which is protected for distribution to adults is not necessarily constitutionally protected from restriction upon its dissemination to children. In other words, the concept of obscenity or of unprotected matter may vary according to the group to whom the questionable material is directed or from whom it is quarantined. Because of the State's exigent interest in preventing distribution to children of objectionable material, it can exercise its power to protect the health, safety, welfare and morals of its community by barring the distribution to children of books recognized to be suitable for adults."

Appellant's attack is not that New York was without power to draw the line at age 17. Rather, his contention is the broad proposition that the scope of the constitutional freedom of expression secured to a citizen to read or see material concerned with sex cannot be made to depend upon whether the citizen is an adult or a minor. He accordingly insists that the denial to minors under 17 of access to material condemned by § 484–h, insofar as that material is not obscene for persons 17 years of age or older, constitutes an unconstitutional deprivation of protected liberty.

We have no occasion in this case to consider the impact of the guarantees of freedom of expression upon the totality of the relationship of the minor and the State, cf. *In re Gault,* 387 U. S. 1, 13. It is enough for the purposes of this case that we inquire whether it was

constitutionally impermissible for New York, insofar as § 484–h does so, to accord minors under 17 a more restricted right than that assured to adults to judge and determine for themselves what sex material they may read or see. We conclude that we cannot say that the statute invades the area of freedom of expression constitutionally secured to minors.[5]

Appellant argues that there is an invasion of protected rights under § 484–h constitutionally indistinguishable from the invasions under the Nebraska statute forbidding children to study German, which was struck down in *Meyer* v. *Nebraska,* 262 U. S. 390; the Oregon statute interfering with children's attendance at private and parochial schools, which was struck down in *Pierce* v. *Society of Sisters,* 268 U. S. 510; and the statute compelling children against their religious scruples to give the flag salute, which was struck down in *West Virginia*

---

[5] Suggestions that legislatures might give attention to laws dealing specifically with safeguarding children against pornographic material have been made by many judges and commentators. See, *e. g., Jacobellis* v. *Ohio,* 378 U. S. 184, 195 (opinion of JUSTICES BRENNAN and Goldberg); *id.,* at 201 (dissenting opinion of THE CHIEF JUSTICE); *Ginzburg* v. *United States,* 383 U. S. 463, 498, n. 1 (dissenting opinion of MR. JUSTICE STEWART); *Interstate Circuit, Inc.* v. *City of Dallas,* 366 F. 2d 590, 593; *In re Louisiana News Co.,* 187 F. Supp. 241, 247; *United States* v. *Levine,* 83 F. 2d 156; *United States* v. *Dennett,* 39 F. 2d 564; R. Kuh, Foolish Figleaves? 258–260 (1967); Emerson, Toward a General Theory of the First Amendment, 72 Yale L. J. 877, 939 (1963); Gerber, A Suggested Solution to the Riddle of Obscenity, 112 U. Pa. L. Rev. 834, 848 (1964); Henkin, Morals and the Constitution: The Sin of Obscenity, 63 Col. L. Rev. 391, 413, n. 68 (1963); Kalven, The Metaphysics of the Law of Obscenity, 1960 Sup. Ct. Rev. 1, 7; Magrath, The Obscenity Cases: Grapes of Roth, 1966 Sup. Ct. Rev.'7, 75.

The obscenity laws of 35 other States include provisions referring to minors. The laws are listed in Appendix B to this opinion. None is a precise counterpart of New York's § 484–h and we imply no view whatever on questions of their constitutionality.

*State Board of Education* v. *Barnette,* 319 U. S. 624. We reject that argument. We do not regard New York's regulation in defining obscenity on the basis of its appeal to minors under 17 as involving an invasion of such minors' constitutionally protected freedoms. Rather § 484–h simply adjusts the definition of obscenity "to social realities by permitting the appeal of this type of material to be assessed in terms of the sexual interests . . ." of such minors. *Mishkin* v. *New York,* 383 U. S. 502, 509; *Bookcase, Inc.* v. *Broderick, supra,* at 75, 218 N. E. 2d, at 671. That the State has power to make that adjustment seems clear, for we have recognized that even where there is an invasion of protected freedoms "the power of the state to control the conduct of children reaches beyond the scope of its authority over adults . . . ." *Prince* v. *Massachusetts,* 321 U. S. 158, 170.[6] In *Prince* we sustained the convic-

---

[6] Many commentators, including many committed to the proposition that "[n]o general restriction on expression in terms of 'obscenity' can . . . be reconciled with the first amendment," recognize that "the power of the state to control the conduct of children reaches beyond the scope of its authority over adults," and accordingly acknowledge a supervening state interest in the regulation of literature sold to children, Emerson, Toward a General Theory of the First Amendment, 72 Yale L. J. 877, 938, 939 (1963):

"Different factors come into play, also, where the interest at stake is the effect of erotic expression upon children. The world of children is not strictly part of the adult realm of free expression. The factor of immaturity, and perhaps other considerations, impose different rules. Without attempting here to formulate the principles relevant to freedom of expression for children, it suffices to say that regulations of communication addressed to them need not conform to the requirements of the first amendment in the same way as those applicable to adults."

See also Gerber, *supra,* at 848; Kalven, *supra,* at 7; Magrath, *supra,* at 75. *Prince* v. *Massachusetts* is urged to be constitutional authority for such regulation. See, *e. g.,* Kuh, *supra,* at 258–260;

tion of the guardian of a nine-year-old girl, both members of the sect of Jehovah's Witnesses, for violating the Massachusetts Child Labor Law by permitting the girl to sell the sect's religious tracts on the streets of Boston.

The well-being of its children is of course a subject within the State's constitutional power to regulate, and, in our view, two interests justify the limitations in § 484-h upon the availability of sex material to minors under 17, at least if it was rational for the legislature to find that the minors' exposure to such material might be harmful. First of all, constitutional interpretation has consistently recognized that the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society. "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Prince* v. *Massachusetts, supra,* at 166. The legislature could properly conclude that parents and others, teachers for example, who have this primary responsibility for children's well-being are entitled to the support of laws designed to aid discharge of that responsibility. Indeed, subsection 1 (f)(ii) of § 484-h expressly recognizes the parental role in assessing sex-related material harmful to minors according "to prevailing standards in the adult community as a whole with respect to what is suitable material for minors." Moreover, the prohibition against sales to minors does not bar parents who so desire from purchasing the magazines for their children.[7]

Comment, Exclusion of Children from Violent Movies, 67 Col. L. Rev. 1149, 1159–1160 (1967); Note, Constitutional Problems in Obscenity Legislation Protecting Children, 54 Geo. L. J. 1379 (1966).

[7] One commentator who argues that obscenity legislation might be constitutionally defective as an imposition of a single standard of public morality would give effect to the parental role and accept

The State also has an independent interest in the well-being of its youth. The New York Court of Appeals squarely bottomed its decision on that interest in *Bookcase, Inc.* v. *Broderick, supra,* at 75, 218 N. E. 2d, at 671. Judge Fuld, now Chief Judge Fuld, also emphasized its significance in the earlier case of *People* v. *Kahan,* 15 N. Y. 2d 311, 206 N. E. 2d 333, which had struck down the first version of § 484–h on grounds of vagueness. In his concurring opinion, *id.,* at 312, 206 N. E. 2d, at 334, he said:

> "While the supervision of children's reading may best be left to their parents, the knowledge that parental control or guidance cannot always be provided and society's transcendent interest in protecting the welfare of children justify reasonable regulation of the sale of material to them. It is, therefore, altogether fitting and proper for a state to include in a statute designed to regulate the sale of pornography to children special standards, broader than those embodied in legislation aimed at controlling dissemination of such material to adults."

In *Prince* v. *Massachusetts, supra,* at 165, this Court, too, recognized that the State has an interest "to protect the welfare of children" and to see that they are "safeguarded from abuses" which might prevent their "growth into free and independent well-developed men

---

laws relating only to minors. Henkin, Morals and the Constitution: The Sin of Obscenity, 63 Col. L. Rev. 391, 413, n. 68 (1963):

"One must consider also how much difference it makes if laws are designed to protect only the morals of a child. While many of the constitutional arguments against morals legislation apply equally to legislation protecting the morals of children, one can well distinguish laws which do not impose a morality on children, but which support the right of parents to deal with the morals of their children as they see fit."

See also Elias, Sex Publications and Moral Corruption: The Supreme Court Dilemma, 9 Wm. & Mary L. Rev. 302, 320–321 (1967).

and citizens." The only question remaining, therefore, is whether the New York Legislature might rationally conclude, as it has, that exposure to the materials proscribed by § 484–h constitutes such an "abuse."

Section 484–e of the law states a legislative finding that the material condemned by § 484–h is "a basic factor in impairing the ethical and moral development of our youth and a clear and present danger to the people of the state." It is very doubtful that this finding expresses an accepted scientific fact.[8] But obscenity is not protected expression and may be suppressed without a showing of the circumstances which lie behind the phrase "clear and present danger" in its application to protected speech. *Roth* v. *United States, supra,* at 486–487.[9] To sustain state power to exclude material defined as obscenity by § 484–h requires only that we be able to say that it was not irrational for the legislature to find that exposure to material condemned by the statute is harmful to minors. In *Meyer* v. *Nebraska, supra,* at 400, we were able to say that children's knowledge of the German language "cannot reasonably be regarded as harmful." That cannot be said by us of minors' reading and seeing sex material. To be sure, there is no lack of "studies" which purport to demonstrate that obscenity is or is not "a basic factor in impairing the ethical and moral development of . . . youth and a clear and present

---

[8] Compare *Memoirs* v. *Massachusetts,* 383 U. S., at 424 (opinion of DOUGLAS, J.) with *id.,* at 441 (opinion of Clark, J.). See Kuh, *supra,* cc. 18–19; Gaylin, Book Review, 77 Yale L. J. 579, 591–595 (1968); Magrath, *supra,* at 52.

[9] Our conclusion in *Roth,* at 486–487, that the clear and present danger test was irrelevant to the determination of obscenity made it unnecessary in that case to consider the debate among the authorities whether exposure to pornography caused antisocial consequences. See also *Mishkin* v. *New York, supra; Ginzburg* v. *United States, supra; Memoirs* v. *Massachusetts, supra.*

642

danger to the people of the state." But the growing consensus of commentators is that "while these studies all agree that a causal link has not been demonstrated, they are equally agreed that a causal link has not been disproved either." [10] We do not demand of legislatures

[10] Magrath, *supra*, at 52. See, *e. g., id.*, at 49–56; Dibble, Obscenity: A State Quarantine to Protect Children, 39 So. Cal. L. Rev. 345 (1966); Wall, Obscenity and Youth: The Problem and a Possible Solution, Crim. L. Bull., Vol. 1, No. 8, pp. 28, 30 (1965); Note, 55 Cal. L. Rev. 926, 934 (1967); Comment, 34 Ford. L. Rev. 692, 694 (1966). See also J. Paul & M. Schwartz, Federal Censorship: Obscenity in the Mail, 191–192; Blakey, Book Review, 41 Notre Dame Law. 1055, 1060, n. 46 (1966); Green, Obscenity, Censorship, and Juvenile Delinquency, 14 U. Toronto L. Rev. 229, 249 (1962); Lockhart & McClure, Literature, The Law of Obscenity, and the Constitution, 38 Minn. L. Rev. 295, 373–385 (1954); Note, 52 Ky. L. J. 429, 447 (1964). But despite the vigor of the ongoing controversy whether obscene material will perceptibly create a danger of antisocial conduct, or will probably induce its recipients to such conduct, a medical practitioner recently suggested that the possibility of harmful effects to youth cannot be dismissed as frivolous. Dr. Gaylin of the Columbia University Psychoanalytic Clinic, reporting on the views of some psychiatrists in 77 Yale L. J., at 592–593, said:

"It is in the period of growth [of youth] when these patterns of behavior are laid down, when environmental stimuli of all sorts must be integrated into a workable sense of self, when sensuality is being defined and fears elaborated, when pleasure confronts security and impulse encounters control—it is in this period, undramatically and with time, that legalized pornography may conceivably be damaging."

Dr. Gaylin emphasizes that a child might not be as well prepared as an adult to make an intelligent choice as to the material he chooses to read:

"[P]sychiatrists . . . made a distinction between the reading of pornography, as unlikely to be per se harmful, and the permitting of the reading of pornography, which was conceived as potentially destructive. The child is protected in his reading of pornography by the knowledge that it is pornographic, *i. e.*, disapproved. It is outside of parental standards and not a part of his identification

"scientifically certain criteria of legislation." *Noble State Bank* v. *Haskell,* 219 U. S. 104, 110. We therefore cannot say that § 484–h, in defining the obscenity of material on the basis of its appeal to minors under 17, has no rational relation to the objective of safeguarding such minors from harm.

## II.

Appellant challenges subsections (f) and (g) of § 484–h as in any event void for vagueness. The attack on subsection (f) is that the definition of obscenity "harmful to minors" is so vague that an honest distributor of publications cannot know when he might be held to have violated § 484–h. But the New York Court of Appeals construed this definition to be "virtually identical to the Supreme Court's most recent statement of the elements of obscenity. [*Memoirs* v. *Massachusetts,* 383 U. S. 413, 418]," *Bookcase, Inc.* v. *Broderick, supra,* at 76, 218 N. E. 2d, at 672. The definition therefore gives "men in acting adequate notice of what is prohibited" and does not offend the requirements of due process. *Roth* v. *United States, supra, at* 492; see also *Winters* v. *New York,* 333 U. S. 507, 520.

As is required by *Smith* v. *California,* 361 U. S. 147, § 484–h prohibits only those sales made "knowingly." The challenge to the *scienter* requirement of subsection (g) centers on the definition of "knowingly" insofar as it includes "reason to know" or "a belief or ground for belief which warrants further inspection or inquiry of both: (i) the character and content of any material described herein which is reasonably susceptible of examination by the defendant, and (ii) the age of the

processes. To openly permit implies parental approval and even suggests seductive encouragement. If this is so of parental approval, it is equally so of societal approval—another potent influence on the developing ego." *Id.,* at 594.

minor, provided however, that an honest mistake shall constitute an excuse from liability hereunder if the defendant made a reasonable bona fide attempt to ascertain the true age of such minor."

As to (i), § 484–h was passed after the New York Court of Appeals decided *People* v. *Finkelstein,* 9 N. Y. 2d 342, 174 N. E. 2d 470, which read the requirement of *scienter* into New York's general obscenity statute, § 1141 of the Penal Law. The constitutional requirement of *scienter,* in the sense of knowledge of the contents of material, rests on the necessity "to avoid the hazard of self-censorship of constitutionally protected material and to compensate for the ambiguities inherent in the definition of obscenity," *Mishkin* v. *New York, supra,* at 511. The Court of Appeals in *Finkelstein* interpreted § 1141 to require "the vital element of scienter" and defined that requirement in these terms: "A reading of the statute [§ 1141] as a whole clearly indicates that only those who are *in some manner aware of the character of the material* they attempt to distribute should be punished. It is not innocent but *calculated* purveyance of filth which is exorcised . . . ." 9 N. Y. 2d, at 344–345, 174 N. E. 2d, at 471. (Emphasis supplied.) In *Mishkin* v. *New York, supra,* at 510–511, we held that a challenge to the validity of § 1141 founded on *Smith* v. *California, supra,* was foreclosed in light of this construction. When § 484–h was before the New York Legislature its attention was directed to *People* v. *Finkelstein,* as defining the nature of *scienter* required to sustain the statute. 1965 N. Y. S. Leg. Ann. 54–56. We may therefore infer that the reference in provision (i) to knowledge of "the *character* and content of any material described herein" incorporates the gloss given the term "character" in *People* v. *Finkelstein.* In that circumstance *Mishkin* requires rejection of appellant's challenge to provision (i) and makes it unnecessary for

us to define further today "what sort of mental element is requisite to a constitutionally permissible prosecution," *Smith* v. *California, supra,* at 154.

Appellant also attacks provision (ii) as impermissibly vague. This attack however is leveled only at the proviso according the defendant a defense of "honest mistake" as to the age of the minor. Appellant argues that "the statute does not tell the bookseller what effort he must make before he can be excused." The argument is wholly without merit. The proviso states expressly that the defendant must be acquitted on the ground of "honest mistake" if the defendant proves that he made "a reasonable bona fide attempt to ascertain the true age of such minor." Cf. 1967 Penal Law § 235.22 (2), n. 1, *supra.*

*Affirmed.*

[For concurring opinion of MR. JUSTICE HARLAN see *post,* p. 704.]

## APPENDIX A TO OPINION OF THE COURT.

New York Penal Law § 484–h as enacted by L. 1965, c. 327, provides:

§ 484–h. Exposing minors to harmful materials

1. Definitions. As used in this section:

(a) "Minor" means any person under the age of seventeen years.

(b) "Nudity" means the showing of the human male or female genitals, pubic area or buttocks with less than a full opaque covering, or the showing of the female breast with less than a fully opaque covering of any portion thereof below the top of the nipple, or the depiction of covered male genitals in a discernibly turgid state.

(c) "Sexual conduct" means acts of masturbation, homosexuality, sexual intercourse, or physical contact with a person's clothed or unclothed genitals, pubic area, buttocks or, if such person be a female, breast.

(d) "Sexual excitement" means the condition of human male or female genitals when in a state of sexual stimulation or arousal.

(e) "Sado-masochistic abuse" means flagellation or torture by or upon a person clad in undergarments, a mask or bizarre costume, or the condition of being fettered, bound or otherwise physically restrained on the part of one so clothed.

(f) "Harmful to minors" means that quality of any description or representation, in whatever form, of nudity, sexual conduct, sexual excitement, or sado-masochistic abuse, when it:

(i) predominantly appeals to the prurient, shameful or morbid interest of minors, and

(ii) is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors, and

(iii) is utterly without redeeming social importance for minors.

(g) "Knowingly" means having general knowledge of, or reason to know, or a belief or ground for belief which warrants further inspection or inquiry of both:

(i) the character and content of any material described herein which is reasonably susceptible of examination by the defendant, and

(ii) the age of the minor, provided however, that an honest mistake shall constitute an excuse from liability hereunder if the defendant made a reasonable bona fide attempt to ascertain the true age of such minor.

2. It shall be unlawful for any person knowingly to sell or loan for monetary consideration to a minor:

(a) any picture, photograph, drawing, sculpture, motion picture film, or similar visual representation or image of a person or portion of the human body which depicts nudity, sexual conduct or sado-masochistic abuse and which is harmful to minors, or

(b) any book, pamphlet, magazine, printed matter however reproduced, or sound recording which contains any matter enumerated in paragraph (a) of subdivision two hereof, or explicit and detailed verbal descriptions or narrative accounts of sexual excitement, sexual conduct or sado-masochistic abuse and which, taken as a whole, is harmful to minors.

3. It shall be unlawful for any person knowingly to exhibit for a monetary consideration to a minor or knowingly to sell to a minor an admission ticket or pass or knowingly to admit a minor for a monetary consideration to premises whereon there is exhibited, a motion picture, show or other presentation which, in whole or in part, depicts nudity, sexual conduct or sado-masochistic abuse and which is harmful to minors.

4. A violation of any provision hereof shall constitute a misdemeanor.

## APPENDIX B TO OPINION OF THE COURT.

State obscenity statutes having some provision referring to distribution to minors are:

Cal. Pen. Code §§ 311–312 (Supp. 1966); Colo. Rev. Stat. Ann. §§ 40–9–16 to 40–9–27 (1963); Conn. Gen. Stat. Rev. §§ 53–243 to 53–245 (Supp. 1965); Del. Code Ann., Tit. 11, §§ 435, 711–713 (1953); Fla. Stat. Ann. §§ 847.011–847.06 (1965 and Supp. 1968); Ga. Code Ann. §§ 26–6301 to 26–6309a (Supp. 1967); Hawaii Rev.

Laws § 267–8 (1955); Idaho Code Ann. §§ 18–1506 to 18–1510 (Supp. 1967); Ill. Ann. Stat., c. 38, §§ 11–20 to 11–21 (Supp. 1967); Iowa Code Ann. §§ 725.4–725.12 (1950); Ky. Rev. Stat. §§ 436.100–436.130, 436.540–436.580 (1963 and Supp. 1966); La. Rev. Stat. §§ 14:91.11, 14:92, 14:106 (Supp. 1967); Me. Rev. Stat. Ann., Tit. 17, §§ 2901–2905 (1964); Md. Ann. Code, Art. 27, §§ 417–425 (1957 and Supp. 1967); Mass. Gen. Laws Ann., c. 272, §§ 28–33 (1959 and Supp. 1968); Mich. Stat. Ann. §§ 28.575–28.579 (1954 and Supp. 1968); Mo. Ann. Stat. §§ 563.270–563.310 (1953 and Supp. 1967); Mont. Rev. Codes Ann. §§ 94–3601 to 94–3606 (1947 and Supp. 1967); Neb. Rev. Stat. §§ 28–926.09 to 28–926.10 (1965 Cum. Supp.); Nev. Rev. Stat. §§ 201.250, 207.180 (1965); N. H. Rev. Stat. Ann. §§ 571–A:1 to 571–A:5 (Supp. 1967); N. J. Stat. Ann. §§ 2A:115–1.1 to 2A:115–4 (Supp. 1967); N. C. Gen. Stat. § 14–189 (Supp. 1967); N. D. Cent. Code §§ 12–21–07 to 12–21–09 (1960); Ohio Rev. Code Ann. §§ 2903.10–2903.11, 2905.34–2905.39 (1954 and Supp. 1966); Okla. Stat. Ann., Tit. 21, §§ 1021–1024, 1032–1039 (1958 and Supp. 1967); Pa. Stat. Ann., Tit. 18, §§ 3831–3833, 4524 (1963 and Supp. 1967); R. I. Gen. Laws Ann. §§ 11–31–1 to 11–31–10 (1956 and Supp. 1967); S. C. Code Ann. §§ 16–414.1 to 16–421 (1962 and Supp. 1967); Tex. Pen. Code, Arts. 526, 527b (1952 and Supp. 1967); Utah Code Ann. §§ 76–39–5, 76–39–17 (Supp. 1967); Vt. Stat. Ann., Tit. 13, §§ 2801–2805 (1959); Va. Code Ann. §§ 18.1–227 to 18.1–236.3 (1960 and Supp. 1966); W. Va. Code Ann. § 61–8–11 (1966); Wyo. Stat. Ann. §§ 6–103, 7–148 (1957).

Mr. Justice Stewart, concurring in the result.

A doctrinaire, knee-jerk application of the First Amendment would, of course, dictate the nullification of

this New York statute.[1] But that result is not required, I think, if we bear in mind what it is that the First Amendment protects.

The First Amendment guarantees liberty of human expression in order to preserve in our Nation what Mr. Justice Holmes called a "free trade in ideas."[2] To that end, the Constitution protects more than just a man's freedom to say or write or publish what he wants. It secures as well the liberty of each man to decide for himself what he will read and to what he will listen. The Constitution guarantees, in short, a society of free choice. Such a society presupposes the capacity of its members to choose.

When expression occurs in a setting where the capacity to make a choice is absent, government regulation of that expression may co-exist with and even implement First Amendment guarantees. So it was that this Court sustained a city ordinance prohibiting people from imposing their opinions on others "by way of sound trucks with loud and raucous noises on city streets."[3] And so it was that my Brothers BLACK and DOUGLAS thought that the First Amendment itself prohibits a person from foisting his uninvited views upon the members of a captive audience.[4]

I think a State may permissibly determine that, at least in some precisely delineated areas, a child[5]—like someone in a captive audience—is not possessed of that

[1] The First Amendment is made applicable to the States through the Fourteenth Amendment. *Stromberg* v. *California,* 283 U. S. 359.

[2] *Abrams* v. *United States,* 250 U. S. 616, 630 (dissenting opinion).

[3] *Kovacs* v. *Cooper,* 336 U. S. 77, 86.

[4] *Public Utilities Comm'n* v. *Pollak,* 343 U. S. 451, 466 (dissenting opinion of MR. JUSTICE BLACK), 467 (dissenting opinion of MR. JUSTICE DOUGLAS).

[5] The appellant does not challenge New York's power to draw the line at age 17, and I intimate no view upon that question.

full capacity for individual choice which is the presupposition of First Amendment guarantees. It is only upon such a premise, I should suppose, that a State may deprive children of other rights—the right to marry, for example, or the right to vote—deprivations that would be constitutionally intolerable for adults.[6]

I cannot hold that this state law, on its face,[7] violates the First and Fourteenth Amendments.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK concurs, dissenting.

While I would be willing to reverse the judgment on the basis of *Redrup* v. *New York*, 386 U. S. 767, for the reasons stated by my Brother FORTAS, my objections strike deeper.

If we were in the field of substantive due process and seeking to measure the propriety of state law by the standards of the Fourteenth Amendment, I suppose there would be no difficulty under our decisions in sustaining this act. For there is a view held by many that the so-called "obscene" book or tract or magazine has a deleterious effect upon the young, although I seriously doubt the wisdom of trying by law to put the fresh, evanescent, natural blossoming of sex in the category of "sin."

That, however, was the view of our preceptor in this field, Anthony Comstock, who waged his war against "obscenity" from the year 1872 until his death in 1915. Some of his views are set forth in his book Traps for the Young, first published in 1883, excerpts from which I set out in Appendix I to this opinion.

---

[6] Compare *Loving* v. *Virginia*, 388 U. S. 1, 12; *Carrington* v. *Rash*, 380 U. S. 89, 96.

[7] As the Court notes, the appellant makes no argument that the material in this case was not "harmful to minors" within the statutory definition, or that the statute was unconstitutionally applied.

The title of the book refers to "traps" created by Satan "for boys and girls especially." Comstock, of course, operated on the theory that every human has an "inborn tendency toward wrongdoing which is restrained mainly by fear of the final judgment." In his view any book which tended to remove that fear is a part of the "trap" which Satan created. Hence, Comstock would have condemned a much wider range of literature than the present Court is apparently inclined to do.[1]

It was Comstock who was responsible for the Federal Anti-Obscenity Act of March 3, 1873. 17 Stat. 598. It was he who was also responsible for the New York Act which soon followed. He was responsible for the organization of the New York Society for the Suppression of Vice, which by its act of incorporation was granted one-half of the fines levied on people successfully prosecuted by the Society or its agents.

I would conclude from Comstock and his Traps for the Young and from other authorities that a legislature could not be said to be wholly irrational[2] (*Ferguson*

---

[1] Two writers have explained Comstock as follows:

"He must have known that he could not wall out from his own mind all erotic fancies, and so he turned all the more fiercely upon the ribaldry of others." H. Broun & M. Leech, Anthony Comstock 27 (1927).

A notable forerunner of Comstock was an Englishman, Thomas Bowdler. Armed with a talent for discovering the "offensive," Bowdler expurgated Shakespeare's plays and Gibbon's History of the Decline and Fall of the Roman Empire. The result was "The Family Shakespeare," first published in 10 volumes in 1818, and a version of Gibbon's famous history "omitting everything of an immoral or irreligious nature, and incidentally rearranging the order of chapters to be in the strict chronology so dear to the obsessional heart." M. Wilson, The Obsessional Compromise, A Note on Thomas Bowdler (1965) (paper in Library of the American Psychiatric Association, Washington, D. C.).

[2] "The effectiveness of more subtle forms of censorship as an instrument of social control can be very great. They are effective over

v. *Skrupa,* 372 U. S. 726; and see *Williamson* v. *Lee Optical Co.,* 348 U. S. 483; *Daniel* v. *Family Ins. Co.,* 336 U. S. 220; *Olsen* v. *Nebraska,* 313 U. S. 236) if it decided that sale of "obscene" material to the young should be banned.[3]

The problem under the First Amendment, however, has always seemed to me to be quite different. For its mandate (originally applicable only to the Federal Government but now applicable to the States as well by reason of the Fourteenth Amendment) is directed to any law "abridging the freedom of speech, or of the press." I appreciate that there are those who think that

a wider field of behavior than is propaganda in that they affect convivial and 'purely personal' behavior.

"The principle is that certain verbal formulae shall not be stated, in print or in conversation; from this the restriction extends to the discussion of certain topics. A perhaps quite rationally formulated taboo is imposed; it becomes a quasi-religious factor for the members of the group who subscribe to it. If they are a majority, and the taboo does not affect some master-symbol of an influential minority, it is apt to become quite universal in its effect. A great number of taboos—to expressive and to other acts—are embodied in the *mores* of any people. The sanction behind each taboo largely determines its durability—in the sense of resistance opposed to the development of contradictory *counter-mores,* or of simple disintegration from failure to give returns in personal security. If it is to succeed for a long time, there must be recurrent reaffirmations of the taboo in connection with the sanctioning power.

"The occasional circulation of stories about a breach of the taboo and the evil consequences that flowed from this to the offender *and* to the public cause (the sanctioning power) well serves this purpose. Censorship of this sort has the color of voluntary acceptance of a ritualistic avoidance, in behalf of oneself and the higher power. A violation, after the primitive patterns to which we have all been exposed, strikes at both the sinner and his god." The William Alanson White Psychiatric Foundation Memorandum: Propaganda & Censorship, 3 Psychiatry 628, 631 (1940).

[3] And see Gaylin, Book Review: The Prickly Problems of Pornography, 77 Yale L. J. 579, 594.

"obscenity" is impliedly excluded; but I have indicated on prior occasions why I have been unable to reach that conclusion.[4] See *Ginzburg* v. *United States,* 383 U. S.

---

[4] My Brother HARLAN says that no other Justice of this Court, past or present, has ever "stated his acceptance" of the view that "obscenity" is within the protection of the First and Fourteenth Amendments. *Post,* at 705. That observation, however, should not be understood as demonstrating that no other members of this Court, since its first Term in 1790, have adhered to the view of my Brother BLACK and myself. For the issue "whether obscenity is utterance within the area of protected speech and press" was only "squarely presented" to this Court for the first time in 1957. *Roth* v. *United States,* 354 U. S. 476, 481. This is indeed understandable, for the state legislatures have borne the main burden in enacting laws dealing with "obscenity"; and the strictures of the First Amendment were not applied to them through the Fourteenth until comparatively late in our history. In *Gitlow* v. *New York,* 268 U. S. 652, decided in 1925, the Court assumed that the right of free speech was among the freedoms protected against state infringement by the Due Process Clause of the Fourteenth Amendment. See also *Whitney* v. *California,* 274 U. S. 357, 371, 373; *Fiske* v. *Kansas,* 274 U. S. 380. In 1931, *Stromberg* v. *California,* 283 U. S. 359, held that the right of free speech was guaranteed in full measure by the Fourteenth Amendment. But even after these events "obscenity" cases were not inundating this Court; and even as late as 1948, the Court could say that many state obscenity statutes had "lain dormant for decades." *Winters* v. *New York,* 333 U. S. 507, 511. In several cases prior to *Roth,* the Court reviewed convictions under federal statutes forbidding the sending of "obscene" materials through the mails. But in none of these cases was the question squarely presented or decided whether "obscenity" was protected speech under the First Amendment; rather, the issues were limited to matters of statutory construction, or questions of procedure, such as the sufficiency of the indictment. See *United States* v. *Chase,* 135 U. S. 255; *Grimm* v. *United States,* 156 U. S. 604; *Rosen* v. *United States,* 161 U. S. 29; *Swearingen* v. *United States,* 161 U. S. 446; *Andrews* v. *United States,* 162 U. S. 420; *Price* v. *United States,* 165 U. S. 311; *Dunlop* v. *United States,* 165 U. S. 486; *Bartell* v. *United States,* 227 U. S. 427; *Dysart* v. *United States,* 272 U. S. 655; *United States* v. *Limehouse,* 285 U. S. 424. Thus, *Roth* v. *United States, supra,* which involved both a challenge to 18 U. S. C. §1461 (punishing the

463, 482 (dissenting opinion); *Jacobellis* v. *Ohio,* 378 U. S. 184, 196 (concurring opinion of MR. JUSTICE BLACK); *Roth* v. *United States,* 354 U. S. 476, 508 (dissenting opinion). And the corollary of that view, as I expressed it in *Public Utilities Comm'n* v. *Pollak,* 343 U. S. 451, 467, 468 (dissenting opinion), is that Big Brother can no more say what a person shall listen to or read than he can say what shall be published.

This is not to say that the Court and Anthony Comstock are wrong in concluding that the kind of literature New York condemns does harm. As a matter of fact, the notion of censorship is founded on the belief that speech and press sometimes do harm and therefore can be regulated. I once visited a foreign nation where the regime of censorship was so strict that all I could find in the bookstalls were tracts on religion and tracts on mathematics. Today the Court determines the constitutionality of New York's law regulating the sale of literature to children on the basis of the reasonableness of the law in light of the welfare of the child. If the problem of state and federal regulation of "obscenity" is in the field of substantive due process, I see no reason to limit the legislatures to protecting children alone. The "juvenile delinquents" I have known are mostly over

---

mailing of "obscene" material) and, in a consolidated case (*Alberts* v. *California*), an attack upon Cal. Pen. Code § 311 (prohibiting, *inter alia,* the keeping for sale or advertising of "obscene" material), was the first case authoritatively to measure federal and state obscenity statutes against the prohibitions of the First and Fourteenth Amendments. I cannot speak for those who preceded us in time; but neither can I interpret occasional utterances suggesting that "obscenity" was not protected by the First Amendment as considered expressions of the views of any particular Justices of the Court. See, *e. g., Chaplinsky* v. *New Hampshire,* 315 U. S. 568, 571–572; *Beauharnais* v. *Illinois,* 343 U. S. 250, 266. The most that can be said, then, is that no other members of this Court since 1957 have adhered to the view of my Brother BLACK and myself.

50 years of age. If rationality is the measure of the validity of this law, then I can see how modern Anthony Comstocks could make out a case for "protecting" many groups in our society, not merely children.

While I find the literature and movies which come to us for clearance exceedingly dull and boring, I understand how some can and do become very excited and alarmed and think that something should be done to stop the flow. It is one thing for parents [5] and the religious organizations to be active and involved. It is quite a different matter for the state to become implicated as a censor. As I read the First Amendment, it was designed to keep the state and the hands of all state officials off the printing presses of America and off the distribution systems for all printed literature. Anthony Comstock wanted it the other way; he indeed put the police and prosecutor in the middle of this publishing business.

I think it would require a constitutional amendment to achieve that result. If there were a constitutional amendment, perhaps the people of the country would come up with some national board of censorship. Censors are, of course, propelled by their own neuroses.[6]

---

[5] See Appendix II to this opinion.

[6] Reverend Fr. Juan de Castaniza of the 16th century explained those who denounced obscenity as expressing only their own feelings. In his view they had too much reason to suspect themselves of being "obscene," since "vicious men are always prone to think others like themselves." T. Schroeder, A Challenge to Sex Censors 44–45 (1938).

"Obscenity, like witchcraft . . . consists, broadly speaking, of a [delusional] projection of certain emotions (which, as the very word implies, emanate from within) to external things and an endowment of such things (or in the case of witchcraft, of such persons) with the moral qualities corresponding to these inward states. . . .

"Thus persons responsible for the persistent attempts to suppress the dissemination of popular knowledge concerning sex matters betray themselves unwittingly as the bearers of the very impulses they would so ostentatiously help others to avoid. Such persons should

That is why a universally accepted definition of obscenity is impossible. Any definition is indeed highly subjective, turning on the neurosis of the censor. Those who have a deep-seated, subconscious conflict may well become either great crusaders against a particular kind of literature or avid customers of it.[7] That, of course, is the danger of letting any group of citizens be the judges of what other people, young or old, should read. Those would be issues to be canvassed and debated in case of a constitutional amendment creating a regime of censorship in the country. And if the people, in their wisdom, launched us on that course, it would be a considered choice.

Today this Court sits as the Nation's board of censors. With all respect, I do not know of any group in the country less qualified first, to know what obscenity is when they see it, and second, to have any considered judgment as to what the deleterious or beneficial impact of a particular publication may be on minds either, young or old.

I would await a constitutional amendment that authorized the modern Anthony Comstocks to censor literature before publishers, authors, or distributors can be fined or jailed for what they print or sell.

## APPENDIX I TO OPINION OF MR. JUSTICE DOUGLAS, DISSENTING.

### A. COMSTOCK, TRAPS FOR THE YOUNG 20–22 (1883).

And it came to pass that as Satan went to and fro upon the earth, watching his traps and rejoicing over

---

know through their own experience that ignorance of a subject does not insure immunity against the evils of which it treats, nor does the propitiatory act of noisy public disapproval of certain evils signify innocence or personal purity." Van Teslaar, Book Review, 8 J. Abnormal Psychology 282, 286 (1913).

[7] See Appendix III to this opinion.

his numerous victims, he found room for improvement in some of his schemes. The daily press did not meet all his requirements. The *weekly* illustrated papers of crime would do for young men and sports, for brothels, gin-mills, and thieves' resorts, but were found to be so gross, so libidinous, so monstrous, that every decent person spurned them. They were excluded from the home on sight. They were too high-priced for children, and too cumbersome to be conveniently hid from the parent's eye or carried in the boy's pocket. So he resolved to make another trap for boys and girls especially.

He also resolved to make the most of these vile illustrated weekly papers, by lining the news-stands and shop-windows along the pathway of the children from home to school and church, so that they could not go to and from these, places of instruction without giving him opportunity to defile their pure minds by flaunting these atrocities before their eyes.

And Satan rejoiced greatly that professing Christians were silent and apparently acquiesced in his plans. He found that our most refined men and women went freely to trade with persons who displayed these traps for sale; that few, if any, had moral courage to enter a protest against this public display of indecencies, and scarcely one in all the land had the boldness to say to the dealer in filth, "I will not give you one cent of my patronage so long as you sell these devil-traps to ruin the young." And he was proud of professing Christians and respectable citizens on this account, and caused honorable mention to be made of them in general order to his imps, because of the quiet and orderly assistance thus rendered him.

Satan stirred up certain of his willing tools on earth by the promise of a few paltry dollars to improve greatly on the death-dealing quality of the weekly death-traps, and forthwith came a series of new snares of fascinating

construction, small and tempting in price, and baited with high-sounding names. These sure-ruin traps comprise a large variety of half-dime novels, five and ten cent story papers, and low-priced pamphlets for boys and girls.

This class includes the silly, insipid tale, the coarse, slangy story in the dialect of the barroom, the blood-and-thunder romance of border life, and the exaggerated details of crimes, real and imaginary. Some have highly colored sensational reports of real crimes, while others, and by far the larger number, deal with most improbable creations of fiction. The unreal far outstrips the real. Crimes are gilded, and lawlessness is painted to resemble valor, making a bid for bandits, brigands, murderers, thieves, and criminals in general. Who would go to the State prison, the gambling saloon, or the brothel to find a suitable companion for the child? Yet a more insidious foe is selected when these stories are allowed to become associates for the child's mind and to shape and direct the thoughts.

The finest fruits of civilization are consumed by these vermin. Nay, these products of corrupt minds are the eggs from which all kinds of villainies are hatched. Put the entire batch of these stories together, and I challenge the publishers and vendors to show a single instance where any boy or girl has been elevated in morals, or where any noble or refined instinct has been developed by them.

The leading character in many, if not in the vast majority of these stories, is some boy or girl who possesses usually extraordinary beauty of countenance, the most superb clothing, abundant wealth, the strength of a giant, the agility of a squirrel, the cunning of a fox, the brazen effrontery of the most daring villain, and who is utterly destitute of any regard for the laws of God or man. Such a one is foremost among desperadoes, the companion and

beau-ideal of maidens, and the high favorite of some rich person, who by his patronage and indorsement lifts the young villain into lofty positions in society, and provides liberally of his wealth to secure him immunity for his crimes. These stories link the pure maiden with the most foul and loathsome criminals. Many of them favor violation of marriage laws and cheapen female virtue.

## APPENDIX II TO OPINION OF MR. JUSTICE DOUGLAS, DISSENTING.

A SPECIAL TO THE WASHINGTON POST
[March 3, 1968]
*by*
AUSTIN C. WEHRWEIN

*White Bear Lake, Minn., March 2.*—Faced with the threat of a law suit, the school board in this community of 12,000 north of St. Paul is reviewing its mandatory sex education courses, but officials expressed fear that they couldn't please everybody.

Mothers threatened to picket and keep their children home when sex education films are scheduled. Mrs. Robert Murphy, the mother of five who led the protests, charged that the elementary school "took the privacy out of marriage."

"Now," she said, "our kids know what a shut bedroom door means. The program is taking their childhood away. The third graders went in to see a movie on birth and came out adults."

She said second-grade girls have taken to walking around with "apples and oranges under their blouses." Her seventh-grade son was given a study sheet on menstruation, she said, demanding "why should a seventh-grade boy have to know about menstruation?"

Mrs. Murphy, who fears the program will lead to ex-

perimentation, said that it was "pagan" and argued that even animals don't teach their young those things "before they're ready."

"One boy in our block told his mother, 'Guess what, next week our teacher's gonna tell us how daddy fertilized you,'" reported Mrs. Martin Capeder. "They don't need to know all that."

But Norman Jensen, principal of Lincoln School, said that the program, which runs from kindergarten through the 12th grade, was approved by the school district's PTA council, the White Bear Lake Ministerial Association and the district school board. It was based, he said, on polls that showed 80 per cent of the children got no home sex education, and the curriculum was designed to be "matter-of-fact."

The protesting parents insisted they had no objection to sex education as such, but some said girls should not get it until age 12, and boys only at age 15—"or when they start shaving."

(In nearby St. Paul Park, 71 parents have formed a group called "Concerned Parents Against Sex Education" and are planning legal action to prevent sex education from kindergarten through seventh grade. They have also asked equal time with the PTAs of eight schools in the district "to discuss topics such as masturbation, contraceptives, unqualified instructors, religious belief, morality and attitudes.")

The White Bear protesters have presented the school board with a list of terms and definitions deemed objectionable. Designed for the seventh grade, it included vagina, clitoris, erection, intercourse and copulation. A film, called "Fertilization and Birth" depicts a woman giving birth. It has been made optional after being shown to all classes.

Mrs. Ginny McKay, a president of one of the local PTAs defended the program, saying "Sex is a natural and

beautiful thing. We (the PTA) realized that the parents had to get around to where the kids have been for a long time."

But Mrs. Murphy predicted this result: "Instead of 15 [*sic*] and 15-year-old pregnant girls, they'll have 12 and 13-year-old pregnant girls."

## APPENDIX III TO OPINION OF MR. JUSTICE DOUGLAS, DISSENTING.

### (A). T. Schroeder, Obscene Literature and Constitutional Law 277–278 (1911).

It thus appears that the only unifying element generalized in the word "obscene," (that is, the only thing common to every conception of obscenity and indecency), is subjective, is an affiliated emotion of disapproval. This emotion under varying circumstances of temperament and education in different persons, and in the same person in different stages of development, is aroused by entirely different stimuli, and by fear of the judgment of others, and so has become associated with an infinite variety of ever-changing objectives, with not even one common characteristic in objective nature; that is, in literature or art.

Since few men have identical experiences, and fewer still evolve to an agreement in their conceptional and emotional associations, it must follow that practically none have the same standards for judging the "obscene," even when their conclusions agree. The word "obscene," like such words as delicate, ugly, lovable, hateful, etc., is an abstraction not based upon a reasoned, nor sense-perceived, likeness between objectives, but the selection or classification under it is made, on the basis of similarity in the emotions aroused, by an infinite variety of images; and every classification thus made, in turn, depends in each person upon his fears, his hopes, his

prior experience, suggestions, education, and the degree of neuro-sexual or psycho-sexual health. Because it is a matter wholly of emotions, it has come to be that "men think they know because they feel, and are firmly convinced because strongly agitated."

This, then, is a demonstration that obscenity exists only in the minds and emotions of those who believe in it, and is not a quality of a book or picture. Since, then, the general conception "obscene" is devoid of every objective element of unification; and since the subjective element, the associated emotion, is indefinable from its very nature, and inconstant as to the character of the stimulus capable of arousing it, and variable and immeasurable as to its relative degrees of intensity, it follows that the "obscene" is incapable of accurate definition or a general test adequate to secure uniformity of result, in its application by every person, to each book of doubtful "purity."

Being so essentially and inextricably involved with human emotions that no man can frame such a definition of the word "obscene," either in terms of the qualities of a book, or such that, *by it alone,* any judgment whatever is possible, much less is it possible that by any such alleged "test" every other man must reach the same conclusion about the obscenity of every conceivable book. Therefore, the so-called judicial "tests" of obscenity are not standards of judgment, but, on the contrary, by every such "test" the rule of decision is itself uncertain, and in terms invokes the varying experiences of the test[e]rs within the foggy realm of problematical speculation about psychic tendencies, without the help of which the "test" itself is meaningless and useless. It follows that to each person the "test," of criminality, which should be a general standard of judgment, unavoidably becomes a personal and particular standard, differing in all per-

sons according to those varying experiences which they read into the judicial "test." It is this which makes uncertain, and, therefore, all the more objectionable, all the present laws against obscenity. Later it will be shown that this uncertainty in the criteria of guilt renders these laws unconstitutional.

(B). Kallen, The Ethical Aspects of Censorship, in 5 Social Meaning of Legal Concepts 34, 50–51 (N. Y. U. 1953).

To this authoritarian's will, difference is the same thing as inferiority, wickedness and corruption; he can apprehend it only as a devotion to error and a commitment to sin. He can acknowledge it only if he attributes to it moral turpitude and intellectual vice. Above all, difference must be for him, by its simple existence, an aggression against the good, the true, the beautiful and the right. His imperative is to destroy it; if he cannot destroy it, to contain it; if he cannot contain it, to hunt it down, cut it off and shut it out.

Certain schools of psychology suggest that this aggression is neither simple nor wholly aggression. They suggest that it expresses a compulsive need to bring to open contemplation the secret parts of the censor's psychosomatic personality, and a not less potent need to keep the secret and not suffer the shamefaced dishonor of their naked exposures. The censor's activities, in that they call for a constant public preoccupation with such secret parts, free his psyche from the penalties of such concern while transvaluing at the same time his pursuit and inspection of the obscene, the indecent, the pornographic, the blasphemous and the otherwise shameful into an honorable defense of the public morals. The censor, by purporting, quite unconscious of his actual dynamic, to protect the young from corruption, frees his conscious-

ness to dwell upon corruption without shame or dishonor. Thus, Anthony Comstock could say with overt sincerity: "When the genius of the arts produces obscene, lewd and lascivious ideas, the deadly effect upon the young is just as perceptible as when the same ideas are represented by gross experience in prose and poetry. . . . If through the eye and ear the sensuous book, picture or story is allowed to enter, the thoughts will be corrupted, the conscience seared, so such things reproduced by fancy in the thoughts awaken forces for evil which will explode with irresistible force carrying to destruction every human safeguard to virtue and honor." Did not evil Bernard Shaw, who gave the English language the word *comstockery*, declare himself, in his preface to *The Shewing-Up of Blanco Posnet*, "a specialist in immoral, heretical plays . . . to force the public to reconsider its morals"? So the brave Comstock passionately explored and fought the outer expressions of the inner forces of evil and thus saved virtue and honor from destruction.

But could this observation of his be made, save on the basis of introspection and not the scientific study of others? For such a study would reveal, for each single instance of which it was true, hundreds of thousands of others of which it was false. Like the correlation of misfortune with the sixth day of the week or the number 13, this basic comstockery signalizes a fear-projected superstition. It is an externalization of anxiety and fear, not a fact objectively studied and appraised. And the anxiety and fear are reaction-formations of the censor's inner self.

Of course, this is an incomplete description of the motivation and logic of censorship. In the great censorial establishments of the tradition, these more or less unconscious drives are usually items of a syndrome whose dominants are either greed for pelf, power, and prestige, reinforced by anxiety that they might be lost,

or anxiety that they might be lost reinforced by insatiable demands for more.

Authoritarian societies usually insure these goods by means of a prescriptive creed and code for which their rulers claim supernatural origins and supernatural sanctions. The enforcement of the prescriptions is not entrusted to a censor alone. The ultimate police-power is held by the central hierarchy, and the censorship of the arts is only one department of the thought-policing.

(C). CRAWFORD, LITERATURE AND THE PSYCHOPATHIC, 10 PSYCHOANALYTIC REVIEW 440, 445–446 (1923).

Objection, then, to modern works on the ground that they are, in the words of the objectors, "immoral," is made principally on the basis of an actual desire to keep sexual psychopathies intact, or to keep the general scheme of repression, which inevitably involves psychopathic conditions, intact. The activities of persons professionally or otherwise definitely concerned with censorship furnish proof evident enough to the student of such matters that they themselves are highly abnormal. It is safe to say that every censorship has a psychopath back of it.

Carried to a logical end, censorship would inevitably destroy all literary art. Every sexual act is an instinctive feeling out for an understanding of life. Literary art, like every other type of creative effort, is a form of sublimation. It is a more conscious seeking for the same understanding that the common man instinctively seeks. The literary artist, having attained understanding, communicates that understanding to his readers. That understanding, whether of sexual or other matters, is certain to come into conflict with popular beliefs, fears, and taboos because these are, for the most part, based on error. . . . [T]he presence of an opinion concerning which one thinks it would be unprofitable, immoral, or

unwise to inquire is, of itself, strong evidence that that opinion is nonrational. Most of the more deep-seated convictions of the human race belong to this category. Anyone who is seeking for understanding is certain to encounter this nonrational attitude.

The act of sublimation on the part of the writer necessarily involves an act of sublimation on the part of the reader. The typical psychopathic patient and the typical public have alike a deep-rooted unconscious aversion to sublimation. Inferiority and other complexes enter in to make the individual feel that acts of sublimation would destroy his comfortable, though illusory, sense of superiority. Again, there is the realization on the part of the mass of people that they are unable to sublimate as the artist does, and to admit his power and right to do so involves destruction of the specious sense of superiority to him. It is these two forms of aversion to sublimation which account for a considerable part of public objection to the arts. The common man and his leader, the psychopathic reformer, are aiming unconsciously at leveling humanity to a plane of pathological mediocrity.

To the student of abnormal psychology the legend, popular literature, and literature revelatory of actual life, are all significant. In the legend he finds race taboos, in the popular literature of the day he discovers this reinforced by the mass of contemporary and local taboos, in literature that aims to be realistically revelatory of life he finds material for study such as he can hardly obtain from any group of patients. The frankness which he seeks in vain from the persons with whom he comes into personal contact, he can find in literature. It is a field in which advances may be made comparable to the advances of actual scientific research.

Moreover, the student of abnormal psychology will commend realistic, revelatory literature not only to his

patients, who are suffering from specific psychopathic difficulties, but to the public generally. He will realize that it is one of the most important factors in the development of human freedom. No one is less free than primitive man. The farther we can get from the attitude of the legend and its slightly more civilized successor, popular literature, the nearer we shall be to a significant way of life.

(D). J. RINALDO, PSYCHOANALYSIS OF THE "REFORMER" 56–60 (1921).

The other aspect of the humanist movement is a very sour and disgruntled puritanism, which seems at first glance to protest and contradict every step in the libidinous development. As a matter of fact it is just as much an hysterical outburst as the most sensuous flesh masses of Rubens, or the sinuous squirming lines of Louis XV decoration. Both are reactions to the same morbid past experience.

The Puritan like the sensualist rebels at the very beginning against the restraint of celibacy. Unfortunately, however, he finds himself unable' to satisfy the libido in either normal gratification or healthy converted activities. His condition is as much one of super-excitement as that of the libertine. Unable to find satisfaction in other ways, from which for one reason or another he is inhibited, he develops a morbid irritation, contradicting, breaking, prohibiting and thwarting the manifestations of the very exciting causes.

Not being able to produce beautiful things he mars them, smashing stained glass windows, destroying sculptures, cutting down May-poles, forbidding dances, clipping the hair, covering the body with hideous misshapen garments and silencing laughter and song. He cannot build so he must destroy. He cannot create so he hinders creation. He is a sort of social abortionist and like an

abortionist only comes into his own when there is an illegitimate brat to be torn from the womb. He cries against sin, but it is the pleasure of sin rather than the sin he fights. It is the enjoyment he is denied that he hates.

From no age or clime or condition is he absent; but never is he a dominant and deciding factor in society till that society has passed the bounds of sanity. Those who wait the midwife never call in the abortionist, nor does he ever cure the real sickness of his age. That he does survive abnormal periods to put his impress on the repressions of later days is due to the peculiar economy of his behavior. The libertine destroys himself, devouring his substance in self-satisfaction. The reformer devours others, being somewhat in the nature of a tax on vice, living by the very hysteria that destroys his homologous opposite.

In our own day we have reached another of those critical periods strikingly similar in its psychological symptoms and reactions, at least, to decadent Rome. We have the same development of extravagant religious cults, Spiritism, Dowieism, "The Purple Mother," all eagerly seized upon, filling the world with clamor and frenzy; the same mad seeking for pleasure, the same breaking and scattering of forms, the same orgy of gluttony and extravagance, the same crude emotionalism in art, letter and the theater, the same deformed and inverted sexual life.

Homo-sexualism may not be openly admitted, but the "sissy" and his red necktie are a familiar and easily understood property of popular jest and pantomime. It is all a mad jazz jumble of hysterical incongruities, dog dinners, monkey marriages, cubism, birth control, feminism, free-love, verse libre, and moving pictures. Through it all runs the strident note of puritanism. As one grows so does the other. Neither seems to precede or follow.

It would be a rash man indeed who would attempt to give later beginnings to the reform movements than to the license they seem so strongly to contradict. Significant indeed is the fact that their very license is the strongest appeal of the reformer. Every movie must preach a sermon and have a proper ending, but the attempted rape is as seldom missing as the telephone; and it is this that thrills and is expected to thrill.

The same sexual paradox we saw in the eunuch priests and harlot priestesses of Isis we see in the vice-crusading, vice-pandering reformers. Back of it all lies a morbid sexual condition, which is as much behind the anti-alcoholism of the prohibitionist, as behind the cropped head of his puritan father, and as much behind the birth-control, vice-crusading virgins as behind their more amiable sisters of Aphrodite.

Interpreted then in the light of their history, libertinism and reformism cannot be differentiated as cause and effect, action and reaction, but must be associated as a two-fold manifestation of the same thing, an hysterical condition. They differ in externals, only insofar as one operates in license and the other in repression, but both have the same genesis and their development is simultaneous.

(E). H. LASSWELL, PSYCHOPATHOLOGY AND POLITICS
94–96 (1930).

Another significant private motive, whose organization dates from early family days, but whose influence was prominent in adult behavior, was A's struggle to maintain his sexual repressions. ["A" is an unidentified, non-fictional person whose life history was studied by the author.] He erected his very elaborate personal prohibitions into generalized prohibitions for all society, and just as he laid down the law against brother-hatred, he condemned "irregular" sexuality and gambling and drink-

ing, its associated indulgences. He was driven to protect himself from himself by so modifying the environment that his sexual impulses were least often aroused, but it is significant that he granted partial indulgence to his repressed sexuality by engaging in various activities closely associated with sexual operations. Thus his sermons against vice enabled him to let his mind dwell upon rich fantasies of seduction. His crusading ventures brought him to houses of ill fame, where partly clad women were discoverable in the back rooms. These activities were rationalized by arguing that it was up to him as a leader of the moral forces of the community to remove temptation from the path of youth. At no time did he make an objective inquiry into the many factors in society which increase or diminish prostitution. His motives were of such an order that he was prevented from self-discipline by prolonged inspection of social experience.

That A was never able to abolish his sexuality is sufficiently evident in his night dreams and day dreams. In spite of his efforts to "fight" these manifestations of his "antisocial impulses," they continued to appear. Among the direct and important consequences which they produced was a sense of sin, not only a sense of sexual sin, but a growing conviction of hypocrisy. His "battle" against "evil" impulses was only partially successful, and this produced a profound feeling of insecurity.

This self-punishing strain of insecurity might be alleviated, he found, by publicly reaffirming the creed of repression, and by distracting attention to other matters. A's rapid movements, dogmatic assertions, and diversified activities were means of escape from this gnawing sense of incapacity to cope with his own desires and to master himself. Uncertain of his power to control himself, he was very busy about controlling others, and engaged in endless committee sessions, personal conferences, and public meetings for the purpose. He always managed

to submerge himself in a buzzing life of ceaseless activity; he could never stand privacy and solitude, since it drove him to a sense of futility; and he couldn't undertake prolonged and laborious study, since his feeling of insecurity demanded daily evidence of his importance in the world.

A's sexual drives continued to manifest themselves, and to challenge his resistances. He was continually alarmed by the luring fear that he might be impotent. Although he proposed marriage to two girls when he was a theology student, it is significant that he chose girls from his immediate entourage, and effected an almost instantaneous recovery from his disappointments. This warrants the inference that he was considerably relieved to postpone the test of his potency, and this inference is strengthened by the long years during which he cheerfully acquiesced in the postponement of his marriage to the woman who finally became his wife. He lived with people who valued sexual potency, particularly in its conventional and biological demonstration in marriage and children, and his unmarried state was the object of good-natured comment. His pastoral duties required him to "make calls" on the sisters of the church, and in spite of the cheer which he was sometimes able to bring to the bedridden, there was the faint whisper of a doubt that this was really a man's job. And though preaching was a socially respectable occupation, there was something of the ridiculous in the fact that one who had experienced very little of life should pass for a privileged censor of all mankind.

MR. JUSTICE FORTAS, dissenting.

This is a criminal prosecution. Sam Ginsberg and his wife operate a luncheonette at which magazines are offered for sale. A 16-year-old boy was enlisted by his mother to go to the luncheonette and buy some

"girlie" magazines so that Ginsberg could be prosecuted. He went there, picked two magazines from a display case, paid for them, and walked out. Ginsberg's offense was duly reported to the authorities. The power of the State of New York was invoked. Ginsberg was prosecuted and convicted. The court imposed only a suspended sentence. But as the majority here points out, under New York law this conviction may mean that Ginsberg will lose the license necessary to operate his luncheonette.

The two magazines that the 16-year-old boy selected are vulgar "girlie" periodicals. However tasteless and tawdry they may be, we have ruled (as the Court acknowledges) that magazines indistinguishable from them in content and offensiveness are not "obscene" within the constitutional standards heretofore applied. See, e. g., Gent v. Arkansas, 386 U. S. 767 (1967). These rulings have been in cases involving adults.

The Court avoids facing the problem whether the magazines in the present case are "obscene" when viewed by a 16-year-old boy, although not "obscene" when viewed by someone 17 years of age or older. It says that Ginsberg's lawyer did not choose to challenge the conviction on the ground that the magazines are not "obscene." He chose only to attack the statute on its face. Therefore, the Court reasons, we need not look at the magazines and determine whether they may be excluded from the ambit of the First Amendment as "obscene" for purposes of this case. But this Court has made strong and comprehensive statements about its duty in First Amendment cases—statements with which I agree. See, e. g., Jacobellis v. Ohio, 378 U. S. 184, 187–190 (1964) (opinion of BRENNAN, J.).*

---

* "[W]e reaffirm the principle that, in 'obscenity' cases as in all others involving rights derived from the First Amendment guar-

In my judgment, the Court cannot properly avoid its fundamental duty to define "obscenity" for purposes of censorship of material sold to youths, merely because of counsel's position. By so doing the Court avoids the essence of the problem; for if the State's power to censor freed from the prohibitions of the First Amendment depends upon obscenity, and if obscenity turns on the specific content of the publication, how can we sustain the conviction here without deciding whether the particular magazines in question are obscene?

The Court certainly cannot mean that the States and cities and counties and villages have unlimited power to withhold anything and everything that is written or pictorial from younger people. But it here justifies the conviction of Sam Ginsberg because the impact of the Constitution, it says, is variable, and what is not obscene for an adult may be obscene for a child. This it calls "variable obscenity." I do not disagree with this, but I insist that to assess the principle—certainly to apply it—the Court must define it. We must know the extent to which literature or pictures may be less offensive than *Roth* requires in order to be "obscene" for purposes of a statute confined to youth. See *Roth* v. *United States,* 354 U. S. 476 (1957).

I agree that the State in the exercise of its police power—even in the First Amendment domain—may make proper and careful differentiation between adults and children. But I do not agree that this power may be used on an arbitrary, free-wheeling basis. This is not a case where, on any standard enunciated by the Court,

antees of free expression, this Court cannot avoid making an independent constitutional judgment on the facts of the case as to whether the material involved is constitutionally protected." 378 U. S., at 190. See *Cox* v. *Louisiana,* 379 U. S. 536, 545, n. 8 (1965).

the magazines are obscene, nor one where the seller is at fault. Petitioner is being prosecuted for the sale of magazines which he had a right under the decisions of this Court to offer for sale, and he is being prosecuted without proof of "fault"—without even a claim that he deliberately, calculatedly sought to induce children to buy "obscene" material. Bookselling should not be a hazardous profession.

The conviction of Ginsberg on the present facts is a serious invasion of freedom. To sustain the conviction without inquiry as to whether the material is "obscene" and without any evidence of pushing or pandering, in face of this Court's asserted solicitude for First Amendment values, is to give the State a role in the rearing of children which is contrary to our traditions and to our conception of family responsibility. Cf. *In re Gault,* 387 U. S. 1 (1967). It begs the question to present this undefined, unlimited censorship as an aid to parents in the rearing of their children. This decision does not merely protect children from activities which all sensible parents would condemn. Rather, its undefined and unlimited approval of state censorship in this area denies to children free access to books and works of art to which many parents may wish their children to have uninhibited access. For denial of access to these magazines, without any standard or definition of their allegedly distinguishing characteristics, is also denial of access to great works of art and literature.

If this statute were confined to the punishment of pushers or panderers of vulgar literature I would not be so concerned by the Court's failure to circumscribe state power by defining its limits in terms of the meaning of "obscenity" in this field. The State's police power may, within very broad limits, protect the parents and their children from public aggression of panderers and pushers. This is defensible on the theory that they can-

not protect themselves from such assaults. But it does not follow that the State may convict a passive luncheonette operator of a crime because a 16-year-old boy maliciously and designedly picks up and pays for two girlie magazines which are presumably *not* obscene.

I would therefore reverse the conviction on the basis of *Redrup* v. *New York*, 386 U. S. 767 (1967) and *Ginzburg* v. *United States*, 383 U. S. 463 (1966).