186 N.J. Super. 363 (1982)
452 A.2d 704
M., PLAINTIFF,
v.
K., DEFENDANT.
Superior Court of New Jersey, Chancery Division, Bergen County.
Decided August 24, 1982.
*365 Donald L. Garber for plaintiff.
Judith E. Ball for defendant.
Kenneth G. Poller, guardian ad litem (Wurtzel & Poller, attorneys).
KRAFTE, J.J.D.R.C. (temporarily assigned).
There has arisen a novel question during the pendency of this custody dispute: Do the United States and New Jersey Constitutions[1] allow a party to invoke a legislatively-created privilege[2] *366 to prevent the admission of certain material evidence at a child custody hearing? There is a dearth of case law dealing with the privilege under consideration and no published New Jersey decision resolves either inquiry. Thus, we are compelled to do so today.
We begin with an examination of the history of this case.
Plaintiff, the father of the infant child of the marriage, a girl age four, filed a complaint for custody by way of application for order to show cause, on April 20, 1982. At that time plaintiff alleged that defendant, mother of the infant, had wrongfully removed the child from the State of New Jersey.
In response to plaintiff's emergent application, the court scheduled a return date of May 11, 1982, at which time defendant was to show cause why an order should not be entered which would require her to return the infant to New Jersey and would award temporary custody of the infant to plaintiff. Further, the court appointed a guardian ad litem to represent the infant's interests and directed the Bergen County Probation Department and its counterpart in Bibb County, Georgia, where the infant had been removed by defendant, to prepare a custody investigation report.
What is central to our purposes, however, is that attached to plaintiff's emergent application were a number of letters and reports from two psychiatrists, two psychologists and a medical doctor. As will be seen, it is the inclusion in plaintiff's application *367 of one letter[3] from each psychiatrist, both addressed to plaintiff's attorney, which is the genesis of the conflict at hand.
Following the return date of May 11, 1982 the court entered an order on May 12, 1982, which, among other things, directed defendant to return the infant to New Jersey within 72 hours of May 11, 1982, and continued the return to May 17, 1982.[4]
On May 18, 1982, after the return of the previous day, the court entered another order which included a provision calling for an examination of the parties and infant by a court-appointed psychiatrist.
Thereafter, plaintiff, defendant and infant were examined by said psychiatrist, with defendant and the infant each appearing on more than one occasion. The psychiatrist's report was filed with the court on July 19, 1982.[5] Subsequent thereto, amid allegations of sexual abuse of the infant by plaintiff and others, a peremptory custody hearing date was established.
Between the time of the appointment of the psychiatrist on May 18, 1982 and the present there were a number of applications to the court. In one, by way of motion returnable July 16, 1982, defendant's attorney asked that plaintiff be barred from introducing into this case any and all reports, statements, opinions or other evidence, either written or oral, based directly or *368 indirectly on defendant's communications with two certain psychiatrists who are the psychiatrists whose letters were attached to plaintiff's emergent application, and which letters were also presented to the court-appointed psychiatrist as forementioned. The thrust of the nine counts of relief sought by defendant was to totally eliminate from this case any person who had made or seen these two letters (including one judge) and any evidence, oral or written, which may in any way have been "tainted" by exposure to these letters. Defendant also requested the excision from the record of the letters and any reference to the letters.
Defendant contends that she and plaintiff consulted the two psychiatrists for purposes of marriage counseling. By virtue of N.J.S.A. 45:8B-29 (hereinafter referred to as the privilege), defendant advances the position that any communication between her, plaintiff and the two psychiatrists, acting as marriage counselors, is absolutely confidential. Thus, the attachment of these letters to plaintiff's initial application and the release of these letters to others violates the privilege.
Pursuant to N.J.S.A. 2A:84A-30,[6] defendant contends that for the act to have any meaning, communications by either party to these two psychiatrists, made in the setting of marriage counseling, are not admissable evidence, either directly or indirectly, and any person or evidence "exposed" to these letters is "tainted" and must either be removed from the proceedings, stricken from the record and barred from entry into the case.
Carried to the fullest, the relief sought by defendant, if granted, would require the removal as a trial judge of the judge who first had occasion to address this case when plaintiff filed his emergent application and custody complaint,[7] the court-appointed *369 psychiatrist, the Bergen County Probation Department investigator assigned to this case and the guardian ad litem. The letters themselves would have to be removed from the record, references to the letters excised, any evidence in any way derived from or influenced by these letters would have to be stricken or barred and, of course, not permitted would be the in-court testimony of these two psychiatrists, alleged marriage counsellors. We would effectively be dealing with a tabula rasa.
On July 16, 1982 the court entered an order in which the relief requested by defendant was denied in toto. Defendant then came before this court to request a stay of that order pending resolution of her application for appeal. Allowing such a stay would have effectively required a postponment of the custody hearing which was imminent. The best interests and welfare of the infant child, highlighted in this case because of the allegations of her being sexually abused, also mitigated against granting a stay. We denied defendant's request for a stay. This opinion explains our decision.
It is unfortunate that the Legislature left no guidance in the form of a history or notes when it enacted this statute. A brief look at relevant case law is in order.
Research reveals three decisions from our courts which address the privilege. The first is Wichansky v. Wichansky, 126 N.J. Super. 156 (Ch.Div. 1973). In Wichansky the husband subpoenaed a licensed psychologist to testify as to certain conversations which occurred while the parties were engaged in marriage counseling with the psychologist. The court held that the privileges of the Practicing Marriage Counseling Act, supra, and the Practicing Psychology License Act, N.J.S.A. 45:14B-28, were not mutually exclusive; that the privilege under the Practicing Marriage Counseling Act applied to all marriage counselors, whether licensed as such or not, and is also broader in scope as it applies to all communications, whether made in confidence or not. Id. at 158-160. The subpoena was quashed.
*370 In Touma v. Touma, 140 N.J. Super. 544 (Ch.Div. 1976), plaintiff sought the testimony of one Becker on the issue of custody within a matrimonial proceeding. Becker, who practiced marriage counseling pursuant to N.J.S.A. 45:8B-6(a)(3), had previously counseled the parties after being sought out by each. Plaintiff and defendant later entered into a consent order waiving the privilege afforded them by the Act. Becker moved to quash the subpoena requiring his testimony, claiming, among other things, that he, individually, could avail himself of the privilege. Id. at 547.
The Touma court rejected this argument, holding that a marriage counselor cannot claim the privilege for himself where waiver of the privilege had been consented to by the parties.[8]Id. at 551. But the importance of the Touma case to us, as will come to light later, is a "parenthetical" remark contained in Judge Lucchi's opinion.
State v. Roma, 140 N.J. Super. 582 (Law Div. 1976), presented the dilemma of a marriage counselor who had been served with a subpoena duces tecum and subpoena ad testificandum by both prosecutor and defendant and who wished to raise the privilege in response.[9] Thus, the court was faced with a confrontation between the rights of the accused as protected by the United States Constitution and this statutorily created privilege. To no one's surprise, the protections afforded the accused were found to transcend the privilege.
*371 What is it that prompts the Legislature to enact such a privilege? As to the purpose of privileges in general, Dean McCormick's sterling text on evidence proclaims that "Their sole warrant is the protection of interests and relationships which, rightly or wrongly, are regarded as of sufficient social importance to justify some incidental sacrifice of sources of facts needed in the administration of justice." (Emphasis supplied). McCormick's Handbook on the Law of Evidence, (2d. ed., Cleary, 1972), at 152.
The Roma court, stated as to the privilege before us now (at 586), that "the rationale of the privilege ... is that parties to troubled marriages should be encouraged to resort to counseling free of any inhibitions which might result from apprehension of disclosure."
It is clear to this court that the foundation for including the privilege in the act was the Legislature's belief that the privilege would encourage parties to a troubled marriage to seek qualified help, knowing that whatever information passed among the parties and counselors would never be revealed. Full and open disclosure would be encouraged and, hopefully, this would benefit those in pursuit of a solution to the marital problems. This is laudatory. Yet it is inconceivable to us that in promulgating this act, and more particularly the privilege, the Legislature took into consideration the best interests and welfare of the children of a marriage, especially as might affect proper, and indeed, safe custodial placement.
This court has no higher calling than to preserve and protect the best interests and welfare of a child. As was so eloquently proclaimed by Judge Fundler in E. v. T., 124 N.J. Super. 535, 540 (Ch.Div. 1973), "It is basic, however, that in all matters relating to the custody of minor children, the paramount consideration of this and any other court is and should be the safety, happiness, physical, mental and moral welfare of the child."
*372 We have quoted forceful words to describe our responsibilities where children's custody is in issue. Yet it is anomalous that under existing law forceful words appear to be the strongest protection for children placed in the center of a custody dispute, unless, of course, there is available some greater protection. We can think of no better place to look for such safeguards than the United States and New Jersey Constitutions. A determination must first be made, however, that children are persons entitled to such protection.
It has not been until the last two decades that the constitutional rights of minors came into the fore. In an excellent 1979 comment which addresses itself to the First Amendment, freedom of the press, rights of minors, we are apprised of the state of the law as to children's rights. It was therein written that
Until recently, the infringements of children's rights seldom had been before the courts for redress. This was due to the concept of parens patriae which grants the state power of guardianship over minors and almost unlimited discretion in the manner and focus of that power. In addition, on those rare occasions when children's rights issues were litigated, the courts focused on the nature and Constitutionally permissable extent of the states' power over children. Quite simply, there existed no body of law governing the Constitutional rights of minors. In the past ten years, however, there has been an increasing number of cases in this area, and the focus has shifted to the delineation of specific rights for children.
The major impetus for the change is found in the trilogy of decisions by the United States Supreme Court. In Re Gault, Ginsberg v. New York, and Tinker v. Des Moines Independent Community School District were decided in the late 1960's. Although the holdings in earlier cases had the effect of protecting the rights of children, these three decisions initiated and furthered the development of the concept that children are persons under the Constitution and therefore should be protected by it. The Gault-Ginsberg-Tinker trilogy established a policy that the rights of minors are entitled to protection from infringement by the states. [Krafte, "Tinker's Legacy: Freedom of the Press in Public Schools," 28 DePaul L.Rev., No. 2 (1979); footnotes omitted.]
Gerald Gault was 15 years old when he was first taken into custody.[10] The boy who purchased the "girlie" magazine in Ginsberg was 16 years old.[11] John F. Tinker was 16 years old *373 and his sister Beth but 13 when they wore their black arm bands to school.[12] Yet it was not their ages that was the decisive factor in these decisions, it was the freedom affected. In allowing these minors protection afforded by the Federal Constitution, it is clear that the fact that they were minors is not a stumbling block to a court faced with a situation where those who are younger may have an interest sufficiently impaired or infringed.
No arbitrary rule can be imposed to determine when an individual has reached a level where he/she is "old enough" to be allowed to take advantage of all rights embodied in our State and Federal Constitutions. The resolution of a custody dispute by the court involves factors which may and do affect the quality of life of children, no matter what age they may be at the time of a custody determination. Such children, in a vulnerable position must indeed be afforded the same protection of an adult where fundamental interests stand to be jeopardized. Thus, it is our determination today that the child (four years old) in this custody dispute is a person under the New Jersey and United States Constitutions and as such is entitled to all their appropriate protections.
Having found this child to be a person entitled to constitutional protections, we find further that the net effect of upholding the privilege in this case would be to deprive this child of due process to which she is entitled; that is, she would be denied the right to have introduced in this proceeding material evidence relevant to a determination of what custodial arrangement is in her best interests and welfare.[13] This brings us to the "paranthetical" *374 remark in Touma, to which we alluded earlier. The comment of Judge Lucchi therein is most appropriate in describing this child's constitutional right to have evidence available to her. In commenting on the effect of allowing the marriage counselor to invoke the privilege, the court proclaimed that such "would deprive litigants of their proprietary right to information. Moreover, the statute would hamper the parties seeking to produce relevant, competent evidence at trial, in violation of procedural due process." Touma, supra 140 N.J. Super. at 561.
The ultimate result of permitting this privilege to be invoked is the interference with this girl's emotional well being, happiness, best interests and welfare, each taken in its broadest sense and each, we find, also protected by the forementioned provisions[14] of our State[15] and Federal Constitutions.
The constitutional rights of the infant in this case clearly outweigh the interest of the State in fostering rehabilitation of unhealthy marriages. In balancing these factors the scales of justice tip sharply in the infant's favor, and on this basis we cannot let the privilege prevail in this or any other child custody case.
We find that "children" are "persons" under both the United States and New Jersey Constitutions and as such, are afforded all appropriate protections thereunder. To permit N.J.S.A. 45:8B-29 (the privilege) to be invoked is to interfere with that protection. Therefore, having so found, we declare that N.J.S.A. 45:8B-29, in child-custody disputes, impermissibly interferes with the aforesaid rights of children, and is unconstitutional.
NOTES
[1] Section 1 of Amendment XIV to the U.S. Constitution, captioned "Citizenship Rights Not To Be Abridged by States," in relevant part declares: "nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

Article I, par. 1, New Jersey Constitution (1947), is entitled "Natural unalienable rights" and reads: "All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness."
[2] The relevant provision of the Practicing Marriage Counseling Act, hereinafter referred to as the act, N.J.S.A. 45:8B-1 et seq., "Confidential Communications; Waiver of Privilege," reads:

Any communication between a marriage counselor and the person or persons counseled shall be confidential and its secrecy preserved. This privilege shall not be subject to waiver, except where the marriage counselor is a party defendant to a civil, criminal or disciplinary action arising from such counseling, in which case, the waiver shall be limited to that action. [N.J.S.A. 45:8B-29]
[3] For purposes of this opinion the precise content of the letters need not be repeated here. For informational purposes only it is noted that both letters were written at plaintiff's request and both touch on points or issues that appear to have arisen during therapy of one or both of the parties with the psychiatrists. One letter is a mere paragraph in length, the other three pages.
[4] We note that although defendant's current attorney of record was not her attorney when this action commenced, defendant at all times was represented by able and competent counsel.
[5] In advance of the examination of plaintiff, defendant and child, the psychiatrist had the opportunity to review certain materials forwarded to him by the parties. Included in these materials, we learn from the psychiatrist's report, were the two letters from the psychiatrists referred to previously and which were attached to plaintiff's initial application.
[6] "Admissibility of Disclosure Wrongfully Compelled" reads "Evidence of a statement or other disclosure is inadmissible against the holder of the privilege if the disclosure was wrongfully made or erroneously required."
[7] The trial judge in whose care this case was from the filing of the order to show cause has removed himself on totally unrelated grounds.
[8] It appears that the fact that the parties consented to waiving the privilege absolved the Touma court from having to address the conflict which we examine here, that is, the interest protected by the privilege versus the best interests and welfare of the child.
[9] Roma was decided nine days before Touma and apparently was not available to the Touma court for reference. A perusal of Roma shows that, while not having such facts before it, the Roma court implied that even mutual waiver of the privilege by the parties may not result in a waiver of the privilege. This is contrary to the decision in Touma.
[10] In Re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967).
[11] Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968).
[12] Tinker v. Des Moines Independent Community School Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).
[13] In essence this child has become a real party in interest. Cf. DeCosmo v. Foreman, 67 N.J. Super. 548 (App.Div. 1961).
[14] See footnote 1.
[15] Cf. Raleigh Fitkin-Paul Morgan Memorial Hospital v. Anderson, 42 N.J. 421 (1964).