**Dale ZIEMANN, Plaintiff,**

v.

**BURLINGTON COUNTY BRIDGE COMMISSION, et al., Defendants.**

**Civ. A. No. 92–4887 (MLP).**

United States District Court, D. New Jersey.

May 25, 1994.

Carol H. Sapakie, Selikoff & Cohen, P.A., Mt. Laurel, NJ, for plaintiff, Dale Ziemann.

Mariette Mooyman, Montgomery, McCracken, Walker & Rhoads, Cherry Hill, NJ, for defendant, Burlington County Bridge Com'n, Constance Borman and Vincent A. Conda.

## OPINION

WOLFSON, United States Magistrate Judge.

Presently before the court are the motions by defendants Burlington County Bridge Commission (the "Bridge Commission"), Constance Borman and Vincent A. Conda (1) to compel the psychiatric and psychological evaluations of plaintiff Dale Ziemann pursuant to *Fed.R.Civ.P.* 35, (2) to compel the release of certain medical and counseling records of plaintiff and (3) for fees and expenses pursuant to *Fed.R.Civ.P.* 37. Additionally, plaintiff has filed (1) a motion to compel the production of defendants' psychiatric report and (2) a cross motion for a protective order pursuant to *Fed.R.Civ.P.* 26(c). Oral argument was held on these matters on May 16, 1994.

### Background

On August 31, 1992, plaintiff, employed by the Bridge Commission as a toll collector, filed a sexual harassment and gender discrimination complaint in the Superior Court of New Jersey. The case was subsequently removed to federal court. In her third amended complaint, Ziemann alleges that defendant Matthew Coccia (now deceased), her immediate supervisor at the Tacony–Palmyra Bridge in Burlington County, New Jersey, continually made offensive remarks and sexual advances toward her from January 1989 through October 1990. Plaintiff contends that she notified Bridge Commission officials, including defendants Borman, Conda and William L. Stemmer, about Coccia's conduct. Ziemann claims that these officials either ignored her appeals or criticized her for making complaints. Ziemann asserts that her numerous requests for reassignment away from Coccia were repeatedly declined. Plaintiff also claims that the defendants contributed to Coccia's misconduct by transferring both plaintiff and Coccia to the Burlington–Bristol Bridge in April 1990.

The third amended complaint contains claims under the New Jersey Law Against Discrimination, N.J.S.A. § 10:5–1, *et seq.;* 42 U.S.C. § 1983; Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e, *et seq.,* and the Equal Protection Clause of the Four-teenth Amendment. In addition to declaratory and injunctive relief, Ziemann seeks damages for embarrassment and mental distress and suffering.

On August 20 and 25, 1993, Dr. Edward H. Tobe, plaintiff's psychiatric expert, examined Ziemann and rendered a report on the latter date. In a follow-up letter dated October 19, Dr. Tobe posits that plaintiff's depression may be characterized as "60% permanent psychiatric disability," half of which is attributable to early childhood and marital difficulties from Ziemann's first marriage and the other half of which is attributable to "the major depressive disorder associated to the workplace."

On January 14, 1994, defendant served a subpoena upon The Counseling Program in Marlton, New Jersey, requesting the production of records relating to plaintiff. Plaintiff has authorized the release of such records except for a portion of a record dated June 25, 1992. On that date, Ziemann commented on certain "advice" from counsel during her session with Dr. Ann E. Steel, her treating physician. Dr. Steel included this advice in her consultation notes. Plaintiff's remark has been redacted pursuant to a claim of attorney-client privilege.

On January 25, Dr. Robert H. Toborowsky, defendant's psychiatric expert, examined plaintiff. On February 1, Dr. Steel recommended a medical leave of absence from work for Ziemann, explaining in a letter to the Bridge Commission that her depression had been "exacerbated recently due to increased stress on the job." Thereafter, on April 21, Dr. Steel advised plaintiff's counsel by letter that Ziemann was "quite upset" at an appointment on December 8, 1993, and was "even more distressed, tearful and anxious" at the next appointment on January 26, 1994, the day after her examination by Dr. Toborowsky. Noting "the increased emotional distress which followed the previous evaluations," Dr. Steel questioned the appropriateness of additional examination. Steel concluded that "further evaluations may be detrimental to [plaintiff's] mental health and may adversely affect her ability to work." Plaintiff's counsel has refused to permit any further examination of Ziemann by defense

experts and, indeed, plaintiff has moved for a protective order to preclude any additional evaluation.

Defense counsel has also conferred with plaintiff's counsel regarding certain counseling in which plaintiff has participated. Ziemann has declined to release records regarding the sessions of her present husband, Jeff Condinho, with counselor Edward Monte. Plaintiff attended these sessions. Additionally, plaintiff received marriage counseling in Wyoming during her first marriage. Ziemann states that she does not recall the name of this counselor and that her efforts to locate the counselor have been unsuccessful.

Accordingly, defendants seek to compel the following: (1) a second psychiatric examination by Dr. Toborowsky and a psychological evaluation by Dr. Peter Badgio; (2) the release of plaintiff's unredacted medical records at The Counseling Program; and (3) the release of records pertaining to the sessions with Edward Monte and the unidentified counselor in Wyoming who counseled plaintiff and her first husband.

Plaintiff opposes the Bridge Commission's motions and seeks the entry of a protective order with regard to these items. Furthermore, Ziemann moves to compel the production of any report rendered by Dr. Toborowsky.

**Discussion**

Prior to considering the specific aspects of the present motions, a brief discussion of the legal standard for protective orders is appropriate. Plaintiff has essentially cross moved for a protective order as to each discovery item that the defense seeks to compel. The court in its discretion can enter a protective order upon a showing of good cause. *Fed. R.Civ.P.* 26(c); *Pansy v. Borough of Stroudsburg,* 23 F.3d 772, 785–87 (3rd Cir.1994). The party seeking the protective order bears the burden of persuasion. *Cipollone v. Liggett Group, Inc.,* 785 F.2d 1108, 1121 (3rd Cir.1986), *cert. denied,* 484 U.S. 976, 108 S.Ct. 487, 98 L.Ed.2d 485 (1987). In *Cipollone,* the Third Circuit established that in order to overcome the presumption and satisfy the good cause requirement, the movant must demonstrate a particular need for protection. *Id.* The court further emphasized

that "[b]road allegations of harm, unsubstantiated by specific examples of articulated reasoning, do not satisfy the Rule 26(c) test." *Id.*

### 1. *Further Examinations of Plaintiff Under Rule 35*

■ Rule 35 of the Federal Rules of Civil Procedure states:

> When the mental or physical condition (including the blood group) of a party or of a person in the custody or under the legal control of a party, is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination by a suitably licensed or certified examiner or to produce for examination the person in the party's custody or legal control. The order may be made only on motion for good cause shown and upon notice to the person to be examined and to all parties and shall specify the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made.

*Fed.R.Civ.P.* 35(a). The Advisory Committee Note of the 1970 Amendment to Rule 35 emphasizes that "before a court order may issue the relevant physical or mental condition must be shown to be 'in controversy' and 'good cause' must be shown for the examination."

The leading case in this area is *Schlagenhauf v. Holder,* 379 U.S. 104, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964). In *Schlagenhauf,* the United States Supreme Court proclaimed that Rule 35 requires "an affirmative showing by the movant that each condition as to which the examination is sought is really and genuinely in controversy and that good cause exists for ordering each particular examination. Obviously, what may be good cause for one type of examination may not be so for another." *Id.* at 118, 85 S.Ct. at 242–43. The Supreme Court explained that Rule 35 demands "discriminating application by the trial judge, who must decide, as an initial matter in every case, whether the party requesting a mental or physical examination or examinations has adequately demonstrated the existence of the Rule's requirements of

'in controversy' and 'good cause,' which requirements ... are necessarily related." *Id.* at 118–19, 85 S.Ct. at 243.

Rule 35 does not restrict the number of evaluations that a party may be required to undergo. *Moore v. Calavar Corp.,* 142 F.R.D. 134, 135 (W.D.La.1992). Each request for an examination necessarily turns on its own facts and subsequent evaluation may be appropriate where the initial evaluation was inadequate or incomplete. *Id.* The cases denying requests for additional examinations have generally underscored the absence of changed circumstances that might warrant further evaluation. *See, e.g., id.* at 135–36; *Rutherford v. Alben,* 1 F.R.D. 277, 278 (S.D.W.Va.1940).

█ Because there is no substantial dispute as to whether Ziemann's mental condition is "in controversy," [1] the court's analysis under Rule 35 must focus on whether "good cause" exists for further examination of plaintiff by defense experts. Plaintiff contends that her pre-hiring psychological examination by the Bridge Commission in 1988, coupled with the more recent examinations by Tobe and Toborowsky, should preclude any further mental evaluation, which would be oppressive and harassing. Furthermore, Ziemann argues that the defense has been accorded "ample access" to her psychiatric history by means of her deposition testimony and the disclosure of her medical records. Plaintiff Brief, at 7. Plaintiff also underscores Dr. Steel's opinion that further mental examination would adversely affect her and that the Bridge Commission "apparently intends to terminate her employment once her unpaid family leave is exhausted." *Id.* at 7–8.

Against the important concern that plaintiff may indeed be adversely affected by further examination, the court must weigh the defendants' compelling need to examine Ziemann as to recent developments regarding her condition. Apparently, due to a further, serious deterioration of her emotional state, plaintiff has not worked at the Bridge Commission since February 1, 1994. When Dr. Toborowsky evaluated plaintiff, she was working. Given this significant change in Ziemann's mental condition, it is clear that defendants' current evaluation is incomplete and that the defendants should be allowed to examine plaintiff as to these developments. While the court is loathe to subject plaintiff to unnecessary examination, it must be noted that Ziemann, as the plaintiff in this matter, cannot be permitted to avoid her discovery responsibilities.

Moreover, it would be inappropriate to preclude the Bridge Commission from fur-

---

1. A plaintiff must assert a claim of mental or psychiatric injury in order to place her mental condition in controversy. *Peters v. Nelson,* 153 F.R.D. 635 (N.D.Iowa 1994) (citations omitted). Nevertheless, in cases both involving and not involving sexual discrimination, there appears to be considerable disagreement as to whether a mere allegation of emotional distress places the plaintiff's mental condition "in controversy." Compare *Tomlin v. Holecek,* 150 F.R.D. 628, 630 (D.Minn.1993) (permitting mental evaluation where plaintiff security guard alleged severe psychological injury from assault at work site) *and Zabkowicz v. West Bend Co.,* 585 F.Supp. 635, 636 (E.D.Wis.1984) (ordering psychiatric examination where claims of emotional distress from sexual harassment at workplace placed mental condition in controversy) *with Bridges v. Eastman Kodak Co.,* 850 F.Supp. 216, 221 (S.D.N.Y. 1994) (refusing request for mental examination where there was neither a separate tort claim for emotional distress nor an allegation of ongoing mental injury) *and Robinson v. Jacksonville Shipyards, Inc.,* 118 F.R.D. 525, 531 (M.D.Fla.1988) (denying mental examination in case involving solely a hostile work environment claim under Title VII where allegation that defendants' conduct seriously affected plaintiff's psychological well-being did not place her mental condition in controversy). This case is distinguishable from those denying mental examination, however, because Ziemann's allegations of distinct psychological injuries comprise the almost-exclusive element of damages. Moreover, Ziemann has presented an expert report in support of her alleged "60% permanent psychiatric disability." The decisions sanctioning evaluation by defense experts have generally entailed the plaintiff's introduction of psychiatric testimony at trial, which the defense is then permitted to rebut by testimony as to its own mental evaluation. *See, e.g., Arnold v. City of Seminole,* 614 F.Supp. 853 (E.D.Okla. 1985); *Sand v. George P. Johnson Co.,* No. 79-73425, 1982 WL 31007 (E.D.Mich.1982). Consequently, it is clear that Ziemann has placed her mental condition in controversy. It should be noted that neither in its papers nor at oral argument did plaintiff's counsel object to further evaluation on the grounds that Ziemann's mental condition was not in controversy under Rule 35.

ther examination on the grounds of either its 1988 evaluation or the Tobe examination. The former occurred prior to any litigation and, indeed, prior to the date that plaintiff actually began working at the Bridge Commission. The latter was the examination by plaintiff's own expert. Dr. Tobe's demeanor and conduct at the first meeting with Ziemann, which caused great distress to plaintiff,[2] cannot be ascribed to the defense in any way as a means of preventing further, appropriate examination.

Likewise, Dr. Steel's speculation regarding the Bridge Commission's medical leave policy as applied to Ziemann is simply irrelevant to this discovery. This does not constitute the "particular need" for protection that Rule 26 requires.

The court also observes that, by her own admission during her deposition, Ziemann endured a "very upsetting" experience when being examined by Tobe, her own expert, rather than by Toborowsky. Ziemann Deposition Transcript, at 180. Indeed, plaintiff declared that the Toborowsky evaluation troubled her only because "it's the principle of it that's upsetting on these things." *Id.* at 183. Plaintiff's apparent difficulty with the adversary process cannot form the basis for precluding the defense from appropriate discovery. Furthermore, the affidavit submitted by Ziemann does not address her purported distress stemming from the Tobe and Toborowsky evaluations. With little more than Steel's unsupported statement (contained in her April 21 letter) regarding Ziemann's "increased emotional distress" from examinations,[3] plaintiff seeks to prevent defendants from obtaining information as to basic elements of this case, such as the ex-

tent of Ziemann's alleged psychological injuries and the cause or causes thereof. This position cannot be sustained.

Finally, it is appropriate to permit examinations by both defendants' psychiatric and psychological experts. Their analyses will focus on different areas of thought and behavior. Psychiatry is a branch of medicine dealing with the study, treatment and prevention of mental disorders. *Dorland's Illustrated Medical Dictionary* 1383 (27th ed. 1988). Psychology is a branch of science addressing the mind and mental processes, especially in connection to human behavior. *Id.* at 1384. *See generally* David L. Rosenhan & Martin E.P. Seligman, *Abnormal Psychology* 623 (1984). Both analyses are necessary for a thorough evaluation of Ziemann in light of recent developments in her mental condition. *See Peters v. Nelson,* 153 F.R.D. 635 (N.D.Iowa 1994) (overruling plaintiff's objection to evaluation by neuropsychologist after plaintiff had already submitted to examination by psychologist).

Consequently, in balancing the relative interests of the parties, the court finds that there is good cause to permit a second psychiatric evaluation by Dr. Toborowsky and a psychological evaluation by Dr. Badgio.

### 2. *Redacted Records from The Counseling Program*

Defendants seek the production of the unredacted record, dated June 25, 1992, from The Counseling Program. Defendants contend that plaintiff has waived any attorney-client privilege with regard to this record because she revealed the attorney-client communication to a third person, her treating

---

**2.** At her deposition, plaintiff explained that she met with Tobe on August 20 for only 10–15 minutes because he was not prepared for the evaluation. Ziemann Deposition Transcript, at 181. Ziemann stated that the experience was "very upsetting" because Dr. Tobe "picked up, like, a stack of stuff and he threw it and said, what is this _____? He didn't even know what to ask me. He said, I am not reading through X amount of pages of _____ or something and I mean that, I mean, it's upsetting, number one, that I had to go there and answer questions that didn't even have to do with any, I don't know, it was upsetting and then to know that I had to go back again." *Id.* at 180.

**3.** The Court notes an apparent inconsistency in the opinions expressed by Dr. Steel regarding the recent changes in plaintiff's mental condition. Steel's February 1 letter does not raise the concern that the Tobe and Toborowsky examinations were overly stressful for plaintiff. Rather, this letter points to "increased stress on the job" as the key factor in recommending that plaintiff take a medical leave of absence from the Bridge Commission. Indeed, it is not until her April 21 letter that Steel addresses the distress allegedly caused by the evaluations.

physician. Ziemann asserts that the communication retained its privileged character *because* she disclosed it to her treating physician, a person with whom there is a confidential relationship. In support of this argument, plaintiff cites N.J.S.A. § 2A:84A–20(1)(c)(iv) (*see also N.J. R.Evid.* 504(1)(c)(iv)), which empowers the client to prevent the disclosure of attorney-client communications by a third person if the communications came to the knowledge of such person in the course of a recognized confidential or privileged communication between the client and the person.

The starting point for the court's analysis is Rule 501 of the Federal Rules of Civil Procedure. Rule 501 provides:

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of the claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

*Fed.R.Evid.* 501.

In federal question cases, the federal common law of privileges is applicable. *William T. Thompson Co. v. General Nutrition Corp., Inc.,* 671 F.2d 100, 103 (3rd Cir.1982). *See also Wei v. Bodner,* 127 F.R.D. 91 (D.N.J. 1989). In *Thompson,* a decision that declined to recognize an accountant-client privilege, the Third Circuit held that "when there are federal law claims in a case also presenting state law claims, the federal rule favoring admissibility, rather than any state law privilege, is the controlling rule." *Id.* at 104. The *Thompson* court noted, however, that

"[o]ur holding does not, of course, preclude resort to state law analogies for the development of a federal common law of privileges in instances where the federal rule is unsettled." *Id.*

■ In this case, where federal jurisdiction is based upon the presence of federal claims (although there are state law claims as well), Rule 501 mandates that the federal common law of privileges applies. Consequently, the New Jersey attorney-client privilege as embodied in N.J.S.A. § 2A:84A–20(1)(c)(iv) is not controlling. Under federal law, no case has been cited or found that stands for the proposition that a client's disclosure of a confidential attorney-client communication to her treating physician retains the cloak of the attorney-client privilege. If this type of communication were made to a medical expert, such as a psychiatrist, retained by the attorney to assist in preparation for trial, it would be protected by the attorney-client privilege. *See United States v. Alvarez,* 519 F.2d 1036, 1045–46 (3rd Cir. 1975). *Accord State v. Kociolek,* 23 N.J. 400, 413, 129 A.2d 417 (1957). Such a disclosure is protected because it constitutes a communication to an agent of the attorney. *See United States v. White,* 617 F.2d 1131, 1135 (5th Cir.1980); *Golden Trade, S.r.L. v. Lee Apparel Co.,* 143 F.R.D. 512, 518 (S.D.N.Y. 1992).

In this case, Ziemann disclosed "advice" from her attorney to her treating physician. Clearly, her treating physician has not been retained as an expert to assist plaintiff's counsel in preparation for trial nor did Ziemann's meeting with the physician involve the rendering of an expert opinion as to plaintiff's mental condition. In short, the treating physician was not the agent of plaintiff's attorney. Consequently, Ziemann's disclosure of the advice to the physician waived the attorney-client privilege that previously attached to the communication.[4] *See Westinghouse Elec. Corp. v. Republic of the Philippines,* 951 F.2d 1414, 1424 (3rd Cir.1991);

---

**4.** Moreover, this communication, which plaintiff's therapist considered significant enough to record, is reasonably calculated to lead to the discovery of admissible evidence, since it may give further insight into the stresses acting upon Ziemann, which seem to include the litigation process itself.

*United States v. Rockwell Int'l,* 897 F.2d 1255, 1265 (3rd Cir.1990).

A brief comment regarding the state law in this area is appropriate. Under Rule 501, as interpreted by *Thompson,* the court may look to state law as a guide if the federal law of privileges is unsettled on a particular issue. With respect to N.J.S.A. § 2A:84A-20(1)(c)(iv), which protects attorney-client communications disclosed to a third person with whom the client maintains a confidential relationship, the court notes that plaintiff has not offered any case law interpreting this provision. Indeed, no such case has been found by the court. Therefore, state law does not provide a viable guide for deciding this issue. In contrast, the federal common law is quite clear, and, under Rule 501, the court must rest its decision on that basis. Defendants' motion is granted. The redacted communication is discoverable and plaintiff's counsel shall provide the defense with the redacted text within 10 days of the date of the accompanying Order.

### 3. *Marriage Counseling Records*

 Turning to the requested disclosure of the counseling records associated with Edward Monte and the unidentified marriage counselor in Wyoming, the court must look to the federal common law of privileges with regard to the marriage counselor privilege. Any state law on the issue is not controlling. No case has been cited or found that has recognized a marriage counselor privilege as a matter of federal common law. Nor is there an explicit provision in the Federal Rules of Evidence articulating such a privilege. Rather, when Congress adopted the Rules, it rejected more specific proposed privileges in favor of the general language of Rule 501. In so doing, Congress intended "to provide the courts with the flexibility to develop rules of privilege on a case-by-case basis, and to leave the door open to change." *Trammel v. United States,* 445 U.S. 40, 47, 100 S.Ct. 906, 911, 63 L.Ed.2d 186 (1980). Because they interfere with the legal system's truth-seeking function, however, evidentiary privileges are not favored and are narrowly construed. *Id.* at 50, 100 S.Ct. at 912; *United States v. Nixon,* 418 U.S. 683,

711, 94 S.Ct. 3090, 3109, 41 L.Ed.2d 1039 (1974). In determining whether an evidentiary privilege should apply under Rule 501, a court must first decide whether such a privilege exists or should exist and then must determine how to apply the privilege to the case at bar. *In re Grand Jury (Granite Purchases),* 821 F.2d 946, 955 (3rd Cir.1987), *cert. denied,* 484 U.S. 1025, 108 S.Ct. 749, 98 L.Ed.2d 762 (1988).

As an example of this narrow construction of evidentiary privileges, the court has looked to the psychotherapist-patient privilege recognized by some, but certainly not all, circuits. For example, in *In re Doe,* 964 F.2d 1325 (2nd Cir.1992), the Second Circuit recognized such a privilege under Rule 501 but warned that "the privilege is highly qualified and requires a case-by-case assessment of whether the evidentiary need for the psychiatric history of a witness outweighs the privacy interests of that witness." *Id.* at 1328. In acknowledging the privilege, the *Doe* court considered the "intensely personal information" that a patient relates to his or her psychotherapist as well as the embarrassment that the patient would possibly suffer upon disclosure of such communications. Additionally, the court observed that indiscriminate disclosure might discourage persons from seeking psychiatric help. *Id.* at 1328. *But see In re Grand Jury Proceedings,* 867 F.2d 562 (9th Cir.), *cert. denied,* 493 U.S. 906, 110 S.Ct. 265, 107 L.Ed.2d 214 *reh'g denied,* 493 U.S. 985, 110 S.Ct. 523, 107 L.Ed.2d 524 (1989) (declining to recognize psychotherapist-patient privilege in context of grand jury investigation); *United States v. Corona,* 849 F.2d 562 (11th Cir.1988), *cert. denied,* 489 U.S. 1084, 109 S.Ct. 1542, 103 L.Ed.2d 846 (1989) (rejecting assertion of psychotherapist-patient privilege in federal criminal trials).

In this district, the case of *In re Grand Jury Subpoena (Psychological Treatment Records),* 710 F.Supp. 999 (D.N.J.1989), provides a detailed analysis of the psychotherapist-patient privilege. In that case, the court recognized a psychotherapist-patient privilege in the context of federal grand jury subpoenas. Relying upon the Third Circuit decision in *In re Grand Jury (Granite Pur-*

*chases),* the district court undertook a two-step analysis. First, the court analyzed whether a psychotherapist-patient privilege of some form furthered sufficiently important and overriding interests so that recognition of the privilege would be appropriate under Rule 501. Second, if the privilege were recognized, the court would then determine whether certain factors specific to the particular case would require the privilege to "give way." *Id.* at 1004. Emphasizing the strong policy basis for the privilege, the court recognized the existence of a psychotherapist-patient privilege upon balancing the interests served by the privilege (such as fostering effective treatment and effectuating the patient's privacy concerns) with those weighing against the privilege (such as the potential loss of evidence). *Id.* at 1006–12.

With this background, the court will now turn to the question of whether a marriage counselor privilege protects the communications between Ziemann and either her marriage counselor in Wyoming or Edward Monte. It is clear that the federal courts have not recognized a marriage counselor privilege. As noted previously, neither the Federal Rules of Evidence nor any cases have established such a privilege. Nevertheless, under the two-step analysis described above, the court must still determine whether a marriage counselor privilege "should exist" as a matter of federal common law.

In resolving this issue, the court has examined the law of New Jersey as a guide. *See Thompson,* 671 F.2d at 104. The statutory marriage counselor privilege provides:

> Any communication between a marriage counselor and the person or persons counseled shall be confidential and its secrecy preserved. This privilege shall not be subject to waiver, except where the marriage counselor is a party defendant to a civil, criminal or disciplinary action arising from such counseling, in which case the waiver shall be limited to that action.

N.J.S.A. § 45:8B–29; *N.J. R.Evid.* 510.

The purpose of this privilege is to encourage persons in troubled marriages to seek counseling free of any inhibitions that might result from apprehension of disclosure. *State v. Roma,* 140 N.J.Super. 582, 586, 357 A.2d 45 (Law Div.), *aff'd,* 143 N.J.Super. 504, 363 A.2d 923 (Law Div.1976); *M. v. K.,* 186 N.J.Super. 363, 371, 452 A.2d 704 (Ch. Div. 1982). The marriage counselor privilege under New Jersey law is quite broad in that it renders confidential all communications between the participants. *Wichansky v. Wichansky,* 126 N.J.Super. 156, 160, 313 A.2d 222 (Ch.Div.1973). In contrast, the attorney-client privilege, the psychologist privilege, the doctor-patient privilege and the marital communication privilege protect confidential communications, but not necessarily all communications between the participants. Moreover, while only communications with a licensed psychologist may be privileged under N.J.S.A. § 45:14B–28, the marriage counselor privilege is not lost where the marriage counselor is unlicensed. *Id.*

The defendants have pointed to *Arena v. Saphier,* 201 N.J.Super. 79, 492 A.2d 1020 (App.Div.1985), for the proposition that New Jersey's marriage counselor privilege does not protect relevant documents when a party places her mental condition at issue. Defendants' Opposition Brief, at 17. The *Arena* case, however, dealt with the psychologist privilege of N.J.S.A. § 45:14B–28, rather the marriage counselor privilege of N.J.S.A. § 45:8B–29. In *Arena,* the Appellate Division held that "a psychologist may be compelled to reveal relevant confidences of treatment when the patient tenders her mental or emotional condition in issue during the course of litigation." *Id.* at 81, 492 A.2d 1020. Observing that "important public policy considerations favoring liberal pretrial discovery compel disclosure of all relevant information," the Appellate Division ordered the trial court to conduct an *in camera* review of the psychologist's consultation notes in order to determine their relevance to the medical malpractice action at bar. *Id.*

Under Rule 501, the New Jersey marriage counselor privilege is ·not dispositive in this case. Rather, it is within the court's discretion to look to state law for guidance in assessing Ziemann's assertion of the privilege. There is no doubt that the marriage counselor privilege serves the important purpose of encouraging couples to seek assistance in maintaining and fostering the mari-

tal relationship while at the same time protecting the participants' privacy interests. These privacy interests are the same as have been sanctioned in the psychotherapist-patient privilege—a privilege which has been recognized in this district. *See In re Grand Jury Subpoena,* 710 F.Supp. at 1012.

■ While this court is not prepared to recognize the marriage counselor privilege as a matter of federal common law, it should, however, receive protection as an outgrowth of the psychotherapist-patient privilege. In allowing some protection to communications resulting from the marriage counselor relationship, the court will not, however, permit the breadth of protections offered by N.J.S.A. § 45:8B–29. The privilege will only apply where the counselor is licensed and it will stand on no higher footing than the psychotherapist-patient privilege, *i.e.,* the privilege protects only confidential communications, not all communications. Furthermore, the privilege can be overcome when the need for the communications is compelling. *See id.* at 1004. For instance, in this case, marriage counseling records from Ziemann's first marriage are extremely relevant because plaintiff's mental condition is at issue and her expert has opined that her current mental condition is due, in part, to the experiences of her first marriage. Indeed, the issues of causation and damages will depend heavily for their resolution upon the determination of how Ziemann's first marriage and earlier experiences have contributed to her current mental state. Without discovery relating to these earlier experiences, defendants will be unable to adequately prepare their defense on these issues. In addition, the concern for protecting these records is greatly lessened by the fact that the first marriage has ended in divorce and, thus, the counseling records relating to that marriage could not possibly be said to jeopardize the already failed relationship. In sum, while the marriage counselor privilege will be recognized as subsumed by the psychotherapist-patient privilege, it has been overcome by the facts of this case.

However, plaintiff has advised that she has been unable to ascertain the identity of the marriage counselor in Wyoming. Ziemann Affidavit, at ¶ 13. Plaintiff states that she has telephoned the office of one counselor in Wyoming to determine if she had received counseling there. *Id.* The court will require Ziemann to resume these efforts to identify her counselor. Plaintiff is under a continuing obligation to provide the defense with the Wyoming counseling records if she discovers the counselor's identity at any time during this litigation. As an initial matter, the court will require Ziemann to submit an affidavit, within 20 days of the date of the accompanying Order, detailing her more recent efforts to locate the counselor.

■ In addition to the records of Ziemann's first marriage, defendants seek the Monte notes. Plaintiff has certified that she merely attended these sessions and that Monte was Condinho's counselor. *Id.* at ¶ 14. The court observes that, by plaintiff's own admission, no counseling relationship existed between Ziemann and Monte. Thus, it is questionable whether plaintiff may interpose any claim of privilege as to the Monte sessions. Accordingly, the court will order the production of a redacted version of the Monte records. Ziemann shall produce only those references in Monte's notes reflecting comments by her. The court believes that this redaction will strike the proper balance among Mr. Condinho's privacy interests, plaintiff's discovery responsibilities and defendants' legitimate discovery needs. Plaintiff's counsel shall serve a copy of the accompanying Order on Monte, who shall provide the records to plaintiff's counsel, who, in turn, shall produce the redacted records to defendants' counsel within 10 days of receiving the Monte records.

Finally, in reaching these decisions, the court is guided by the case of *United States v. Nixon,* 418 U.S. 683, 710, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974), in which the Supreme Court stated that "[w]hatever their origins, these exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth." In the interests of an adequate and fair discovery and the search for truth, the court will grant defendants' motion and deny plaintiff's cross

motion for a protective order, except as to the aforementioned redaction.

#### 4. *Fees and Expenses Under Rule 37*

■ Rule 37, which addresses motions to compel discovery, provides:

> If the motion is granted or if the disclosure or requested discovery is provided after the motion was filed, the court shall, after affording an opportunity to be heard, require the party or deponent whose conduct necessitated the motion or the party or attorney advising such conduct or both of them to pay to the moving party the reasonable expenses incurred in making the motion, including attorney's fees, unless the court finds ... that the opposing party's nondisclosure, response, or objection was substantially justified....

*Fed.R.Civ.P.* 37(a)(4)(A). The Advisory Committee Note of the 1970 Amendment to Rule 37 explains that "[o]n many occasions, to be sure, the dispute over discovery between the parties is genuine, though ultimately resolved one way or the other by the court. In such cases, the losing party is substantially justified in carrying the matter to court."

Defendants seek an award of their reasonable expenses due to plaintiff's "unjustified" refusal to release the materials at issue on these motions. Defendants' Brief, at 13. The court finds, however, that the response of plaintiff and her counsel to the defendants' applications was substantially justified. An award of fees under Rule 37 is inappropriate. Motion denied.

#### 5. *Defendants' Psychiatric Report*

Finally, Ziemann seeks the production of the report or notes rendered by Dr. Toborowsky upon his examination of plaintiff on January 25. Defendants respond that such a report simply does not exist. Based upon the lack of a final report authored by Toborowsky, as well as the court's decision to permit a second evaluation by Toborowsky, the court will deny plaintiff's motion to compel defendants' psychiatric report.